DENNIS ANDREW BALL
TRUSTEE, ERBIRRETR05/10/01
OFFICE OF THE TRUSTEE
DOWNTOWN STATION-BX4261
PHOENIX, ARIZONA 85030-4261
602/971-1775
602/867-7833 fax

```
____ FILED      ____ LODGED
____ RECEIVED   ____ COPY
        MAY 26 2011
   CLERK U S DISTRICT COURT
    DISTRICT OF ARIZONA
BY_____ P DEPUTY
```

THIS DOCUMENT IS NOT IN PROPER FORM
ACCORDING TO FEDERAL AND/OR LOCAL RULES
AND PRACTICES AND IS SUBJECT TO REJECTION
BY THE COURT.

REFERENCE: _LRCIV 7.1(6)(1)_
         (Rule Number/Section)

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

In Re: Dennis Andrew Ball, Personally and as
Beneficiary of the Eleanor R. Ball IrreLvg
Trust 05/10/01.
                    Plaintiff,
          v.


Estate of JONATHAN P. SCHUBERT;
Surety, 1ST MERCURY INSURANCE;
MORGAN STANLEY SMITH BARNEY;
SOUTHWEST FIDUCIARY, INC, An Arizona
Corporation; GREGORY P. DOVICO and
PEGGY DOVICO, husband and wife; FIDELITY
& DEPOSIT CORP., A ZURICH CORP.; Estate of
A. PAUL BLUNT formerly BLUNT & ASSOCIATES;
JABURG & WILK, An Arizona Limited Liability Co.,
ENCORE SENIOR LIVING, An Arizona Limited
Liability Company; CAROL L. BALL and
CHRISTOPHER KOKISH, husband and wife.
                    Defendants

Case No. 2:11-CV-0655-PHX-MB

**JURY DEMAND
FIRST AMENDED
COMPLAINT**

) COUNTS:
) 1). RICO
) 2).CIVIL RIGHTS 42 Sec 83
) 3) .INDEMNIFICATION
) 4). BREACH OF FID. DUTY
) 5). APSA-TITLE: 46-456
) 6). FRAUD-COMMON LAW
) 7). CONVERSION
) 8). CONSTRUCTIVE TRUST
)9). TORTOUS INTERFERNCE
)     WITH INHERITANCES
) 10).RULE 60 (C)
) 11).VIOLATIONS 14th AMEND.DP
)     The Honorable Michelle Burns

1.     Plaintiff,   Dennis Andrew Ball ("Mr. Ball") upon his oath, affirms, deposes and

believes that the defendants together conspired to defraud plaintiff's mother, Eleanor R

Ball a vulnerable adult as defined by Arizona law; her trust and himself   demanding a

Jury Trial by Rule 38(a)(b), Federal Rules of Civil Procedure; Rule 9(b).

2.     The attached complaint is common to all the defendants and inclusively filed by the plaintiff to bring his cause of action in response for damages he has sustained by the unlawful predicate acts of the defendants. <u>Facts</u> of the acts:

## I.

## ORIGINS OF SUIT

3.     The filing of this suit resonates out of <u>discovery</u> in the Arizona Bankruptcy Court by Audit and was performed by counsel for that discovery by and through Subpoena power of <u>all</u> the important accounting records during the time the Ball Trust Audit was being compiled both in the Bankruptcy Court and the State Court proceedings of defendants client and plaintiff's mother, Eleanor R. Ball.  The audit extended also to other 3rd parties so named in the complaint and filed in separate suits in and outside Arizona by which designates as an Arizona Trust debtor-in possession case number 2:05-bk-21529-PHX-GBN.  As a result, the Discovery Issues affirmed by the audit have never been heard by any Court including denials by the State Court of Arizona over many appeals to the contrary.

4.     Therefore, Notice is hereby given for a Jury trial by USC 7 Rule 38(a)(b) subject to the Federal & Local Rules of Civil Procedure and the dictates of this Court. This notice is consistent with plaintiff's right of "due process" denied him in the State Courts of Arizona.  Together with this demand for Jury, the Plaintiff requests of the Court:

5.     Schedule a Pre-trial Conference for discovery motions including exchange of documents and evidence with time set-aside for depositions and discovery of the defendant's liability to the Plaintiff's

mother's trust and estate of the deceased, Eleanor R. Ball.

6. Make Jury selection a priority by those who are familiar and have

   domiciled with Senior Citizens, handled their finances and health

   care and have interests and concerns of their own regarding the

   conduct of those entrusted to care and manage their loved ones

   before or after the decedent including investigation by "Grand Jury".

7. Allow the Plaintiff to file interrogatories and require they be timely

   filed with the Plaintiff or his Counsel and replied including if needed

   interlocatories to Seal Evidence.

8. The Plaintiff is of the Opinion that Justice delayed is Justice denied

   in any Court and in this case has been denied in the State Court of

   Arizona Probate Administration on all Counts of the filed Complaint.

   The Complaint pleads the facts and describes in detail the conduct

   of the Defendant's unlawful actions during the time of their appointment

   by the State Court throwing their unlawful conduct of their client's estate

   into the Jurisdiction of the United States Bankruptcy Court In And For

   The District of Arizona 2:05-bk-21529-PHX-GBN.  Thereafter, jurisdiction

   of this case can be traced back to its origins in the United States Trustees

   Office for further proceedings consistent with all Counts of this Complaint

   with Jurisdiction rising in the United States Bankruptcy Court due to the

   Court & Fiduciary malfeasance discovered by the plaintiff & presented to the

   United States Department of Justice and United States Attorney for Arizona.

So Sayeth the Affiant:_____

                Dennis Andrew Ball, plaintiff

## II.

## SUMMARY OF COMPLAINT

9. Plaintiff, Dennis Andrew Ball (Mr. Ball), for his Complaint against the Defendants, and each of them, alleges as follows:

10. Using, abusing, misusing their client, Eleanor R. Ball for personal and corporate enrichment of self as a group as defined by 18 USC & 1961, 1962 Federal RICO Racketeering & Corrupt Organizations; Civil Rights Violations Under 42 USC &1983; Breach of Fiduciary Duty, Violations of ARS Title 46-456 "APSA"; Common Law Fraud; Conversion; Constructive Trust; Tortuous Interferences With Inheritances; Rule 60(c) Set-Aside For State Court Misconduct; Violations of U.S.C. 14th Amendment Due Process Rights.

11. This scheme to exploit Mrs. Ball has continued unabated today upon others as demonstrated in the Exhibits and Briefs so prepared for Trial. It is now common knowledge within Court Circles that the Fraud Upon The Court was created in Arizona State Probate Court and has continued since the last prosecution in early 2000 upon which the defendant in that case, Nancy Etta Ellison was sent to State Penitentiary for her role in defrauding and exploiting her clients out of their inheritances and financial legacy. Defendants Dovico took over her company and have since continued fulfilling the criminal syndicate.

12. Accordingly, Plaintiff is seeking and is entitled to recover treble damages, costs, attorneys' fees, and punitive damages in an amount sufficient to properly **Punish** Defendant's conduct and deter Defendants and others similarly situated from engaging in such unlawful conduct in the future with recommendation for criminal prosecution.

## III.
## PARTIES, JURISDICTION AND VENUE

13.     Consistent with Rule 8 (a), plaintiff, Dennis Andrew Ball (Mr. Ball) alleges the following:

14.     At all times, Eleanor R. Ball was an incapacitated adult who resided in the County of Maricopa, State of Arizona.

15.     The acts alleged by plaintiff occurred in the County of Maricopa, State of Arizona.

16.     On or about October 7, 2005, plaintiff, Dennis Andrew Ball was appointed by the United States Bankruptcy Court for the District of Arizona as the permanent Successor Trustee replacing Morgan Stanley [Trust] for an incapacitated adult and as beneficiary of the The Eleanor R. Ball Irrevocable Living Trust 05/10/01, has standing to bring this complaint against the defendants on behalf of Eleanor R. Ball for injuries, pain, suffering, medical bills including relief for economic and non-economic damages suffered by Eleanor R. Ball and plaintiff, Dennis Andrew Ball.

17.     As the sole Successor Trustee, the plaintiff has the lawful authority to pursue his legal claims set forth in this complaint. He is also the sole beneficiary of the estate and trust of his mother; demands relief for himself and her grandchildren as successor beneficiaries.

18.     Defendants, The Estate of Jonathan P. Schubert and 1st Mercury Insurance are liable for the unlawful actions by deceased attorney Jonathan P. Schubert during his appointment as the court appointed lawyer for the Ward, Eleanor R. Ball. The acts alleged against The Estate of Joanathan P. Schubert & 1st Mercury Insurance (surety) which form the bases of plaintiff's complaint occurred in the County of Maricopa, State of Arizona. Defendants Estate of Jonathan P. Schubert & 1st Mercury Insurance

participated in the Enterprise referred to in ARS 46-455 (Q).

19.   Defendants, Morgan Stanley [Trust] dba Morgan Stanley Smith Barney a New York company with an office in Surprise, Arizona accepted and managed the estate and trust assets of Eleanor Ball prior to the Guardianship so appointed by the Maricopa County Superior Court Probate Court on June 3, 2004.

20.   This relationship was established on March 30, 1999 with acceptance of her trust documents later amended on May 10, 2001 as the Eleanor R. Ball Irrevocable Living Trust.

21.   Morgan Stanley Dean Whitter Trust both accepted and approved by written nomination in the event of mental incompetence or death, which ever came first, as Successor Trustee, Article 7. That duty was cancelled upon election by the beneficiary, Dennis Andrew Ball and given himself by the United States Bankruptcy Court after cancellation of their contract on September 21, 2005 from Morgan Stanley Dean Whitter, Surprise, Arizona which he has continued to date in that capacity.

22.   Discovery by the trustee and beneficiary of significant violations of law, errors and omissions committed by both defendants, Morgan Stanley [Trust] and the guardian and conservator, SFI, their owners, officers, and estate administrators as Black entities so listed from the title page and so included in the body of this complaint and common to all.

23.   The acts alleged against Morgan Stanley Smith Barney form the basis of plaintiff's complaint occurred in the County of Maricopa , State of Arizona. Defendants Morgan Stanley Smith Barney, at all times mentioned herein, acted by and through its officers, employees, agents and contractors who were acting within the course and scope of their

employment and authority, and acting as an enterprise as referred in ARS & 46-455 (Q), such that this entity is bound by, and vicariouly liable for the conduct of its officers, employees, agents and contractors. Such a company or other entities are also directly liable for their own negligence, recklessness, and other tortious conduct in the hiring, training and supervision of the officers, employees, agents and contractors whose conduct gives rise to this action.

24.   Defendants Southwest Fiduciary, Inc ("SFI") is an Arizona corporation licensed and operated in the County of Maricopa, State of Arizona with owners, Gregory P. Dovico and Peggy Dovico, husband and wife.  The acts alleged against SFI which form the basis of plaintiff's complaint occurred in the County of Maricopa, State of Arizona with owners Gregory P. Dovico and Peggy Dovico, husband and wife.

25.   Predicate acts by these defendants cost the trust and estate of their client, Eleanor Ball and the plaintiff, Dennis Andrew Ball under the care and control of the defendants at the time of their probate appointments over $1,000,000.00 in actual damages in 22 months by the Fraudulent Concealment of Involuntary Redistribution of Personal Assets (IRA) effectively wiping out  the entire life savings and assets of Eleanor Ball's life trust and estate and involuntarily disinheriting  the beneficiary and plaintiff of his parents trust and estate making defendant, Fidelity & Deposit (surety) also liable for these damages.

26.   These predicate acts were committed in violation of due process by SFI in Probate dismantling and effectively gutting the trust and estate placing the healthcare burden on the Arizona Taxpayers consistent with recent *media* events exposing the Corrupt and Unlawful behavior of Court Officials in Probate and sustained by the Arizona Supreme Court.  The plaintiff has been damaged by the defendants.

27.    Defendant SFI, at all times mentioned herein, acted by and through its officers,

employees, agents , and administrators who were acting within the course and scope

of their employment and authority, and acting as an enterprise as referred to in ARS &

46-455 (Q), such that this entity is bound by, and vicariously liable for, the conduct of

its officers, employees, agents and contractors.  Such company or other entities are

also directly liable for their own negligence, recklessness and other tortious conduct

in the hiring, training and supervision of the officers, employees, agents and contractors

whose conduct gives rise to this action from State Probate Court, PB2004-001053.

28.    Defendants, Encore Senior Living LLC (ESL) aka Encore Senior Village at all

relevant times was a company licensed and operating in the County of Maricopa, State

of Arizona including the Acts alleged against Encore Senior Village, Peoria, Arizona.

29.    In June 2004, Eleanor Ball was placed under the care of Encore Senior Village

(ESV) by SFI and was not allowed to return back to her home after convelescing  for

approximately 2 months prior to August 30, 2004, when the Court took her driver's

license priviledges away and virtually made her a prisoner at Encore Senior Village

ESV by and through SFI making her permanently stay there against her will with staff

administering drugs to calm her down.

30.    This procedure was common in the hyjacking of loved ones by SFI and their

handlers of loved ones and their trusts and estates draining them dry getting them ready

to be bought and paid for by Arizona Long Term Care until the quality of care is so bad,

they give up hope and die.  That was my mother's case which the defendants ESL are

all responsible.  As a result, the plaintiff has been damaged by the isolation, medication,

liquidation and termination of the Ward, his mother, Eleanor R. Ball.

31.    The plaintiff had rights to visit with his own mother the last eight (8) months of her natural life, but those rights where not honored by either SFI or ESL. As a result, the plaintiff has been damaged.

32.    At all times Encore Senior Living aka Encore Senior Village, Peoria, Arizona knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by ARS & 46-451(A)(9).

33.    Knowing that she was proud of her family and desired to have regular visits with the plaintiff, ESL forbade such visits and made it impossible for such visits to occurr while they had her in their custody.  Despite to the contrary, they would not move her to a neutral center so that she may have proper contact and visitation with her natural born children to live out the remainder of her life in emotional calm and peace.  As a result, the plaintiff has been damaged by ARS & 14-456 (Q) and seeks monetary relief by Statue in a sum sufficient to Punish the Defendants and hold them accountable for Criminal Prosecution.

34.    Defendants,  Estate of Arthur Paul Blunt aka Blunt & Associates (formerly) was a licensed attorney practicing law within the State Bar of Arizona holding himself out as being competent and capable of representing the legal ease of his vulnerable adult clients and their financial liquidity and property.

35.    At all times, Blunt represented that he did not represent the interests of his client Carol L. Ball even though he tended court with her on an Order of Protection filed by the plaintiff and had her served in San Diego, California, home of her natural domicile prior to his involvement with her and SFI in Probate matters the following month in early 2004.

36.    In March 2004, defendants A. Paul Blunt, Blunt & Associates with the assistance of staff para-legal Carol Stevens-Gobillard prepared an emergency petition for guardianship for Carol L. Ball placing her in line to take custody and control of Eleanor Ball until the plaintiff objected forcing her to renunciate and allow the Court to decide who should be in control inspite of all the legal ease that had been established for years for Eleanor Ball.  In spite a conflict of interest existed between SFI & his client Carol Ball, he continued to represent both in blatant Rule 42 ethics violations.

37.    Like wild havalena, defendant Blunt could not wait to pounce and tear the family structure apart for sport. Upon investigation and belief, his manicaled attitude of destructive behavior was in full swing along with his addiction to cocaine,  marijuana and other opiates.  The plaintiff notes that on March 31, 2011, A.Paul Blunt is dead.

38.    Because of his addictions, the plaintiff has been damaged by the "raiding" of his mother's trust by the defendant committing felony GRAND THEFT by the double billing of his mother's estate and trust for no value of service but to deplete the parents legacy to satisfy his addictions and waste the remainder of her assets for sport and recreation at the plaintiff's expense.  The plaintiff has been damaged by the defendants and requests relief by all means possible including ARS & 46-456.

39.    Defendants Jaburg & Wilk and attorney Kevin Rattay at all times were a licensed law firm by the State Bar of Arizona employed by SFI to represent Eleanor Ball in Court proceedings in United States Bankruptcy Court beginning in 2005, a year after guardian proceedings had been initiated by her estranged daughter, Carol L. Ball.

40.    However, the defendants participated in fraudulent schemes by withholding information to the Bankruptcy Court regarding his client SFI that negatively impacted

the trust and estate of his client, Eleanor R. Ball and dimunition of its corpus.  As a result of the aggressive and criminally motivated behavior against the plaintiff, his bankruptcy estate was negatively impacted as well, therefore placing this entire matter before the Bankruptcy Court for additional proceedings including Adversarial proceedings.

41.     Questioned at hearing before Judge Redfield Baum, Rattay responded that all the mother's money had been spent both out of the trust by the Dovico and his staff including Schubert and Blunt without any record or approval by the Probate Court Ariz Prob R P 33.  This was in response at a Chapter 7 Bankruptcy hearing where Rattay was ordered to appear with records from the guardian in late September, 2005 regarding the plaintiff's bankruptcy estate the guardian had forced the plaintiff to seek refuge from their dispicable and evil attacks regarding property jointly owned or gifted.

42.     The defendants, Jaburg & Wilk and defendant Kevin Rattay was paid  from proceeds  in excess of $11,000 for billable work that was excessive, wasteful and unreasonable for a vulnerable adult's trust and estate.  The plaintiff has been damaged.

43.     Defendants Carol L. Ball & Christopher Kokish are residents and citizens of San Diego, California residing there all of their adult life.  Defendant Ball was the estranged daughter of Eleanor Ball whom after the death of plaintiff's father, Andrew Ball decided to go on a terror mission of the plantiff and her mother beginning in 1994.

44.     Dennis Andrew Ball is a beneficiary of the Trust and her grandchildren. The defendant was disinherited because the mother was convinced the daughter and son-in-law were both attempting to extort her by devious means thru mail, phone calls, legal motions and failure to show concern and love for both the mother and plaintiff.

45.    The history of the sibling problems and costs associated with them will be

brought out at trial showing that the plaintiff has been damaged by the manipulative

and callous behavior of both defendants and the damage caused to the mother's and

father's legacy by their aggressive and evil conduct resulting in vulnerable elder abuse,

ARS & 46-455.

46.    This Court has federal question jurisdiction over this cause of action, *sua sponte,*

under principles enunciated in *In re Intermagnetics America Inc.* 926 F. 2d 912 (9th

Cir. 1991); *Landis Revin Neutraceuticals v. Arthur Medical, 2007* WL 397144

(E.D. Cal.); *Dixon v. C. J. R.,* 316 F. 2d 1041 (9th Cir. 2003) ; *U.S. v. Arias-Villaneuva,*

998 F.2d 1491 (9th Cir. 1993); 18 U. S. C. & 1621 (1) (fraud on the Court, by officers

of the Court).

47.    Subject matter jurisdiction exists under 28 U.S.C. & 1343(a)(4).

48.    Venue is proper under 28 U.S.C. & 1391, together with Statue specific venue

provisions applicable to the counts enumerated below, including, but not limited to

violations under 42 U.S.C. & 1983. The plaintiff has been damaged by ARS &14-456.

## **CO-DEFENDANTS INCLUDING HISTORY & BACKGROUND**

49.    Co-defendants Christine Kendrick, David R. Mauer, Marcio Buglemen, Mary

Lou Roof are all officers either now or formerly of Morgan Stanley [Trust] and Morgan

Stanley Smith Barney, a New York Corporation with offices in San Francisco, California

and an office in Surprise, Arizona.  Common to all the defendants are the listed Counts

that follow the listing by this action brought for damages by their predicate acts upon the

trust & estate of Eleanor R. Ball and her beneficiary, Dennis Andrew Ball.  Christine

Kendrick, David R. Mauer, Marcio Bugleman, Mary Lou Roof. All officers at one time

for the Successor Trustee of the Trust, Morgan Stanley [Trust]. Christine Kendrick, a

Vice President in the Legal Department for Morgan Stanley Smith Barney, Vice President

David R. Mauer, Marcio Bugleman, Esq., Mary Lou Roof, agent for Morgan Stanley

[Trust] and personal representative of the Eleanor R. Ball Irrevocable Living [Trust].

All of the Co-defendants have been identified by either from the Ball Trust Audit or

the plaintiff having first hand contact and discussions with them regarding his mother's

trust and estate.

50.     These co-defendants for their client,  Eleanor R. Ball  met on numerous

occasions to fulfill their duty to their client without noticing the plaintiff of their actions

in difference to proper court civil procedure and the dictates of the court.. Predicate acts

committed against the Ward and Beneficiary and then later presented to the Court to

be "Rubber Stamped" approved by the Court contrary to Ariz. Prob R 33.  These

listed co-defendants had a duty to protect and preserve the assets of their client for

the benefit of not only their client Eleanor Ball but that duty also extended to the

beneficiaries by law from the Successor Trustee of the trust ARS 14-10801-10.

51.     SFI  Co-defendants Anna Dovico, Phillip Dovico et al. including Diane Levine,

Bruce M. Tripp, Lee Davis, Barbara Desmond & Surety, Fidelity & Deposit Corp.

either directly participated in the Enterprise or contributed or may be liable for the acts

of their owners and superiors as defendants they served or listed by the Ball Audit.

52.     That during the time that Southwest Fiduciary, Inc. et al. allegedly acted on

behalf of Eleanor R. Ball, Southwest Ficuciary, Inc. et al refused to allow the plaintiff

an opportunity to even visit with his mother 8 months prior to her death.

53.     That Southwest Fiduciary, Inc.et al. its owners, officers each in violation and

breach of their Fiduciary Obligations, to both the Ward and Dennis Andrew Ball,

charged excessive amounts to the Trust & Estate of The Eleanor R. Ball Irrevocable

Trust. That an Irrevocable Trust locks the assets in the trust only to be used for

the reasonable care coupled with a State Miller's Income Trust, SFI made no effort

or attempt to efffectively protect the assets of the Ward which was their duty and that

of the co-defendants whose job it was for that purpose. As a result, the plaintiff has been

damaged.

54.    That  co-defendants assisted the Dovico's  engaged in activities  which caused  a

dimunition of the value of Trust Assets and also wasted Trust property rendering

significant predicate acts and damages to both the Trust and the Plaintiff.

55.    That on one occasion, co-defendants &  Dovico gave away without charge,

a residential structure located in Illinois usurping Trustee Authority from Morgan

Stanley [Trust] after being noticed by the plaintiff.  This was a clear violation by

the guardian of breaching their duty to stay out of trust business contracted with

the Successor Trustee, Morgan Stanley of a free and clear property never pledged

for anything as collateral for any loan with the Bank, Mid-County Bank, Metropolis

Illinois who currently holds title. The plaintiff has been damaged.

56.    That the diminution of the value of the property and the wasting of the assets

occurred in total disregard of the fiduciary obligations that DoVico and Southwest

Fiduciary had to Eleanor R. Ball and to the beneficiaries.

57.    Dennis Andrew Ball is a beneficiary of the mother's [Trust] and appeared in

Court in order to protect his interests.  Notwithstanding his efforts, SFI defendants

fought him continuously throughout the course of the administration of the [Trust] in

spite that Morgan Stanley [Trust] had contractually signed and accepted an agreement

with the mother to manage and care for her assets and property both in Arizona & Illinois.

58.    During the guardianship and the administration of the [Trust], SFI incurred large

legal fees, as well as fees on its own behalf in the administration of the [Trust].

Said fees were outrageous, went unaccounted by her former court appointed counsel,

Jonathan P. Schubert who both failed to protect his client and the plaintiff & allowed a

pigfest at the expense of the mother's estate and [Trust].

59.    At no time did defendants of SFI contact Mr. Ball for purposes of seeking

his input with regard to the care of his mother but instead was a hostile party causing

serious injury to both her liquidity and property.  In fact, Southwest Fiduciary disregarded

any suggestions that were made by the plaintiff and was actively fought causing further

incursion of attorney's fees and fees charged by Southwest to the estate and [Trust]

of the Ward to the extent that in spite of court rights, visitation of his mother was denied.

60.    The plaintiff subsequently complained against Southwest Fiduciary with the

Arizona Supreme Court Fiduciary Certification Program.  Southwest responded by

billing the [Trust] for defending itself within that body and other Court proceedings that

were surcharged the plaintiff but then charged the mother for their attorneys fees.

61.    Southwest Fiduciary is a Criminal Syndicate and has destroyed the lives of its

clients, their estates and trusts by and through the "Enterprise" operating in Maricopa

County State of Arizona Probate Court by and through defendants DoVicos & listed staff.

62.    Claims arising under 42 U.S.C. & 1983 are governed under state law for purposes

of the statute of limitations.  The statute of limitations, however, for accrual purposes, is

controlled by federal law.  This includes equitable tolling and/or tolling of the statue for

fraudulent concealment.  Subject matter jurisdiction exists under 28 U.S.C. & 1343(a)(4).

63.    This Court has federal question jurisdiction over this cause of action, *sua sponte,* under principles enuniciated in *In re Intermagnetics America, Inc.* 926 F.2d 912 (9th Cir. 1991); *Landis Revin Neutraceuticals v. Arthur Medical,* 2007 WL397144 (E.D. Cal.); *Dixon v. C. J. R.,* 316 F.2d 1041 (9th Cir. 2003); *U.S. v. Arias-Villanueva,* 998 F.2d 1491 (9th Cir. 1993); 18 U.S.C. & 1621(1) (fraud on the Court, by officers of the Court); including every defendant Black/White Entities upon discovery.

64.    Venue is proper under 28 U.S.C. &1391, together with statue specific venue provisions applicable to the counts enumerated below, including, but not limited to violations under 42 U.S.C.& 1983.  *Each co-defendant is under court jurisdiction.*

65.    Equally disturbing was the legal misconduct of co-defendants from Blunt & Associates including Carol Stevens-Gobillard and others. All participated in a conflict of interest in the trial court representing the interests of both the disinherited daughter and that of their client Southwest Fiduciary, Inc. their owners, the Dovico's and staff. Blunt & Associates participated in the fraud by arranging large transfers of property and money to the "Enterprise" by unlawful means knowing that these transfers would cause damage; injury to the assets of the Ward's [Trust] and estate and unlawfully breaking Court Orders to achieve their goals and breaking the assets by abandoning their liability and client's interest inorder to punish the plaintiff and satisfy their fees. Upon discovery, evidence suggests that Blunt used his client's accounts to satisfy his need for narcotics and was removed as a trustee in 2008 from the Graham Trust, Sanctioned by the Bar and placed on a one year probation starting on April 28, 2010, the day Eleanor Ball died on April 28, 2006. His practice of law was interrupted in spite

the Arizona State Bar allowed him to continue in despite of his unlawful and criminal

conduct and record. Court records show that Court Orders dated August 30, 2004

required <u>all</u> were to sign off on an Illinois Consent Order that never happened but inspite

allowed the transfer of $100,000 from the Bank Of Marion, Illinois to go into an

unrestricted account the Arizona Court Ordered on that date. Never happened with a

subsequent order affirming the same. Never happened that Blunt arranged with Dovico

and Schubert on September 20, 2004 Order Signed by Judge Dean M. Fink whereby

neither the plaintiff nor his attorney, Nancy D. Petersen were ever presented with any

knowledge of the Order until later discovered by investigation.  The plaintiff is damaged.

66.    Spending the Ward's money for unreasonable fees can be traced by records

showing at Encore Senior Living, an Arizona Limited Liability Company charged

excessive monthly fees and caused the separation of the Ward and plaintiff by the

unlawful actions and predicate acts of their co-defendants and staff administrators,

Eileen Major, Barbara Vatz and several other members of their Alzhiemer's Staff.

All of the staff lied in State Court, October 7, 2005 at trial regarding their conduct

on August 26, 2005  regarding a visitation by the plaintiff at the residence of

Eleanor Ball at Encore Senior Village, Peoria, Arizona.  As a consequence of their

untruthful and vexacious testimony, the mother and plaintiff were both punished

without contact the remainder of her natural life.  It is barbaric what goes on in the

Probate System of  Maricopa County Superior Court. The plaintiff has been damaged.

67.    These predicate acts include the prime instigators for all these defendants

self-dealing, self-enrichment behavior at the mother's expense.

68.    The background and history of this experience is quite telling of one

in Bankruptcy with the Court appointing the plaintiff as the current and operative

trustee since before and after his mother's death on April 28, 2006. The plaintiff has

been damaged and demands recovery by Trial by Jury and in Furtherance thereof:

## IV.

## GENERAL ALLEGATIONS COMMON TO ALL DEFENDANTS

79.   Defendant Gregory P. Dovico was, at all relevant times hereto, a director and/or

officer of Defendant SFI.

80.   Defendant Peggy Dovico was, at all relevant times hereto, a director and/or officer

of Defendant SFI.

81.   Defendant Gregory Dovico and Defendant Peggy Dovico (hereinafter collectively

referred to as "Defendants Dovico" or "the Dovicos") were husband and wife acting for,

and in furtherance of, their marital community.

82.   All  named defendants in this suit in the caption of this Complaint or as named

parties in association with those listed at suit are individuals and entities who, on

information and belief, committed acts or omissions or caused events to occurr that

resulted in injury or damage to Eleanor Ball and the plaintiff.

83.   All named Defendants are interrelated, interdependent, and are jointly and

severally liable. The plaintiff has been damaged and demands recovery by Trial by Jury.

84.   Common to all the general allegations regarding all the causes of actions (Counts)

so listed in the caption of the Complaint so listed is also common in the Arizona State

Probate Court STATEMENT OF UNRESOLVED ISSUES-PB2004-001053 dated

May 30, 2007 one year and one month after the death of Eleanor Ball on April 28, 2006.

These issues may be considered without Due Process therefore Orphaned waiting to be

heard *in-personam* Trial by Jury. Predicate acts committed by Probate Officers comply with the Probate Exception *Marshall v. Marshall* and must be heard outside State Probate Court when so presented. Defenses to the Probate Exception do not apply because of the nature of the duty and acts in and for the public trust betrayed and trampeled by the predators in the Court. All predicate acts in State Probate Court void the orders upon which those orders, rulings and judgments where issued and subjects the Court Officials to both civil and criminal prosecution *without immunity* upon discovery and grand jury investigation of predicate acts. All unresolved issues are based on the Ball Trust Audit initiated by investigation in the United States Bankruptcy Court In And For The District of Arizona and are simultaneously filed with this complaint for Adversary Proceedings for exploiting the Trust & Estate of Eleanor R. Ball and the beneficiary, Dennis Andrew Ball.

85.    These Unresolved Issues include:

1). 1st Annual Acounting Approved on March 31, 2006 for lack of proper administration of probate litigation by attorneys Blunt & Schubert from their excessive and unreasonable attorney fees paid to them in the amount $107, 000 including those paid to attorney Kevin Rattay from Jaburg & Wilk of over $11,000 in the United States Bankruptcy Court and to Attorney Fred Turner in the Southern Illinois Courts. This matter is also supported by an order dated October 19, 2004 issued by the Court but lacking the required signatures of Nancy D. Petersen, Attorney for the Plaintiff or the Plaintiff's signature.

2). Mismanagement, abandonment loss of income and property of Illinois Estate during time and period of Court Appointment of SFI and the unlawful transfer of Illinois property to Mid-Country Bank regarding 1110 W. Cherry St., Marion, IL 62959; including an unlawful lien placed by Mid-Country Bank on all Trust Property by the actions of Southwest Fiduciary, Inc. and Arizona attorney A. Paul Blunt.

3). Failure of the Conservator SFI to protect estate assets by the Irrevocable Trust coupled with a Miller's Trust for Income Only to Shelter & Preserve the Assets of the Estate Accordingly to the Rules of Long term care by the State of Arizona.

Carol L. Ball a resident of San Diego, California. She is married to Christopher Kokish. Upon investigation and belief, together both participated in a scheme to use, abuse and misuse both the mother and the plaintiff by contacting them from dawn to dusk, Carol L. Ball used every electronic device to spy and intrude into the lives of the plaintiff and mother including threats of death by proxies. Carol L. Ball is a "freak", both she and her husband. Both committed predicate acts by harassing, billing out the number of attorneys necessary to control their activity, using slanderous language to slight the plaintiff and cause personal injury in the form of economic hardship while the plaintiff was caring for his ailing mother. The conduct of the defendants Carol L. Ball and Christopher Kokish demands a trial by Jury to show the number of predicate acts of extortion, exploitation and tortuous interference with inheritances of the plaintiff. The Ball Audit shows the conflict of interest that existed between herself and A. Paul Blunt during the time of his representation of Southwest Fiduciary, Inc. and Dovico owners and staff let alone the attorney client relationships they established previous to contacting SFI by the "Enterprise" attorney, A. Paul Blunt aka Blunt & Associates damaging the plaintiff.

69.     The Ball Audit shows that the mother's trust paid for both her legal fees of the guardianship and those of Southwest Fiduciary, which Paul Blunt denies. Yet the record shows that the mother was billed for his fees and paid over $65,000.00 he billed including unlawfully being paid for trial work that was assessed to the plaintiff but later legally dissolved by his bankruptcy estate. These are predicate acts to defraud a Vulnerable Adult and are consistent with ARS 46-456 making them eligible for treble damages and punitive awards. On every occasion she could, Carol L. Ball made contact with everybody and anybody that would listen to her complaints about her mother and brother

and made it known that she was out to punish both of them because of being disinherited by her mother.

70.    Carol L. Ball is unlawfully in possession of property (diamond wedding band) belonging to the estate of Eleanor R. Ball by and through these proceedings that require the Court and Jury to litigate and adjudicate since the death of Eleanor R. Ball on April 28, 2006.

71.    All the defendants have known for years that the Rule & Color of law has been breached by its own fraternity, sorority and collegial membership and despite years of complaints and bad behavior, the Public's Due Process and Individual Rights have been sacked by a handful of those *hell bent* in seeing that they are Plundered, Pilfered and Pillaged by the Probate System due to a lack of honest work ethic and a despicable criminal enterprise. This is the behavior common to all at the expense of honest and hard working men and women who spent a lifetime of sweat and sacrifice only to find themselves as vulnerable adults being stripped away of their trusts and estates by Court Orders, billed to the max feeling abandoned with nothing but bad memories.

72.    Defendant Dovicos engaged in petitioning the Court in March 2004 to become the guardian of Eleanor R. Ball by and through their attorney, A. Paul Blunt with the support of defendants Carol L. Ball and Christopher Kokish, living in San Diego, California with the intent to defraud the mother and the plaintiff by fraudulent concealment of trust and estate assets placed in trust for their protection against theft and artifice with Morgan Stanley [Trust]. The plaintiff has been damaged and demands trial by jury.

73.    Defendant  Fidelity & Deposit as perveyors for the surety bond  was purchased by the estate & trust against Southwest Fiduciary in the event it would be necessary to file

claims against if for their client, Eleanor R. Ball. Dovico with the support of the

Judges/Commissioners and probate attorneys created a perfect storm for any law abiding

person to be victimized. The number of complaints filed and victims hurt are enormous

from the enterprise he has created since the incarceration of Nancy Etta Ellison, former

owner of Fiduciary Services, Inc. the company Dovico assumed and has run it with

impunity since 1999, the year he assumed ownership renaming it Southwest Fiduciary,

Inc.

74.    Defendant Estate of Jonathan P. Schubert is liable for the predicate acts of the

Dovicos, family members and staff personnel. 1st Mercury Insurance is the surety

for The Estate of Jonathan P. Schubert and is the malpractice carrier for this attorney's

unlawful conduct during the time of his appointment as the Court appointed lawyer

for the Ward, Eleanor R. Ball. His fiduciary duty extended to not only his client

but to the beneficiaries of the trust and estates of his client's family. Probate law is quite

clear that the primary duty of attorneys in probate is to protect the assets of the Ward

and the family. The Ward's property belongs to them, not the State ARS 14-10802-14.

The Estate of Jonathan P. Schubert on Audit is liable for predicate acts Schubert allowed

in the billing of his client and the billing by those that took an Oath to protect their client

and the Ward. Nothing could be further from the truth. The estate of Jonathan P.

Schubert is liable for Schubert's participation in racketeering of the Ward's property by

allowing the give away of a free and clear property for nothing, approved of the wholesale

looting of the parent's legacy by strangers and proceeded to cause personal injury to the

plaintiff because of the bad behavior he engaged with the daughter and husband; the

Dovico's, A. Paul Blunt and Morgan Stanley [Trust]. Every act to deceive, steal, lie, bear

false representations and causing personal injury are predicate acts by these defendants to cause damage to injure the financial and personal interests of the beneficiary and plaintiff.

75.     The Estate of Jonathan P. Schubert allowed his clients' personal property to be confiscated by the Guardians Dovico and his staff with the assistance of Joesph Neeley, an Illinois attorney on property belonging to the Eleanor R. Ball Irrevocable Trust upon which Morgan Stanley was legally the trustee and only party able to negotiate or sale the property for its value and worth.  Dovico overstepped his authority and used his position to damage the trust with Morgan Stanley's permission and that of defendant Schubert who they also paid out of the trust his excessive and unreasonable attorney fees of $35,000 with little or no value of service in conflict with Arizona Court of Appeals ruling Sleath v. Sleath 1 CA -CV-10-0093 *226 Ariz. 171, 244 P. 3d 1169 (App. 2010)*. These parties knew what they were doing and provided no service for the money they were paid out of both the estate and trust causing both injury and damage to the plaintiff.

76.     By Audit, the Ball trust was looted of its assets by the defendants effectively disinheriting the beneficiaries and plaintiff.  The grand children have been robbed by their aunt allowing the defendants to participate in a fraud upon the court by fraudulent concealment of the involuntary redistribution of the Wards assets by private parties Dovico et al, his attorney, A. Paul Blunt, Morgan Stanley Smith Barney, and the Estate of Jonathan P. Schubert.  All parties are liable for the tort actions including the defendents so listed with them and participated in their predicate acts to damage, injure and destroy the life work of the parents and the property and assets that the plaintiff had preserved and protected after the death of his father on July 21, 1994.

77.  These predicate acts can be defined as a provable pattern of tortuous conduct to

defraud, collude and conspire to defraud a vulnerable adult as defined by APSA-Title

46-456 with violations of court sustained due process and civil rights violations making

void all orders, rulings and judgments so issued in PB2004-001053.  Rule 60 (c) is the

operative word and allows for problems in the State trial court to be revisited and set

aside by another Court, especially when due process violations and Title 42 Section 1983

are in violation.  The trial court should know better than to allow the most basic of both

Arizona Constitutional and Federal Constitutional law to be abridged by virtue of

Appellate process both State and Federal.  Dovico's company and family have done this

since taking control of  Nancy Etta Ellison's Fiduciary Services, Inc. in 1999.  He has

ruled with impunity at all  times at the expense of the Wards and family's the State

Probate Trial Courts have appointed to him with the State Supreme Court Sustaining.

78.  Defendant Morgan Stanley Smith Barney entered into and managed for the Ward

her estate and trust at the time of the formation of the trust in March 1999 and continued

to fulfill their fiduciary obligations up and until the time the Probate Court was

noticed and they withdrew allowing defendant Dovico and his staff to squander, pilfer

and pillage with unlawful authority what they had contracted to do for their Client,

Eleanor R. Ball as her Successor Trustee.  The facts show incontravertible evidence

pointing to their role throughout their asset and property management and the role they

played in the Ward's daily life.  As a consequence, their failure to protect their client's

assets from the exploitation of both the Court officials and the Guardian made it

impossible for the plaintiff  to protect his mother during the time of the Court

Appointment of these defendants outside of firing the Trustee and putting the Trust

4). Failure of Southwest Fiduciary, Inc. to abide by the Court Orders regarding singnatories of <u>all</u> parties to proceed with transfer of funds from the Bank of Marion to it & failure to abide by the Court's October 19, 2004 Order regarding the transfer of funds from the trust account at Morgan Stanley to the nursing home of Encore Senior Village, Peoria, Arizona instead of to itself, SFI.

5). Monies Paid to Attorney Blunt and Schubert be returned from a Judgment against Dennis Ball legally dissolved in his bankruptcy estate back into the Trust Estate of his mother, Eleanor R. Ball Irrevocable Living Trust of $19, 206.53 <u>WITHOUT</u> Prior Court Approval Rule Pro R 33.

6). Restricted Account exploited by the Fiduciary's payments to themselves, nursing home contract and billings from lawyers amounting to over 76% of the total assets of Eleanor R. Ball.

7). Stay <u>All</u> Surety Bonds held on account with Southwest Fiduciary, Inc.

8). Return <u>Mother's Wedding Band</u> for right of ownership by order of the Court.

9). Final Tax Return for 2006 requested for review by plaintiff and counsel.

10). **<u>SANCTIONS BE ISSUED AGAINST SOUTHWEST FIDUCIARY, FOR PAYING $14,562.78 AND OTHER SUMS WITHOUT PRIOR COURT APPROVAL RULE PRO R 33.</u>**

86.    a) Common to all the defendants, from June 2004 until December 2004, Morgan Stanley [Trust] account was spent out over $70,000.00 unaccounted and created a negative Trust balance that had always been maintained properly by the managers and accountants at Morgan Stanley [Trust] for Eleanor Ball.

b). From September 2004 until September 2005, the Wells Fargo Conservator account for Eleanor Ball spent over $102, 809.00 unaccounted and created a negative Estate balance in the Wells Fargo Bank Account for Eleanor Ball.

c). This was followed by additional unaccounted expenditures without prior court approval totalling an additional $50,000.00 from January 31, 2006-February 1, 2006.

Plaintiff attempted to have all of these accounts frozen but to no avail by the State Court.

As a result, the Plaintiff has been damaged. (See URGENT REQUEST! dated

May 4, 2005).

87.    The Swindle continued with objections by the plaintiff to the final accounting filed

on February 23, 2007 goes unattended by the Maricopa County Probate Court from

Discovery made by Audit issued on January 26, 2007 from the Arizona District

Bankruptcy Court. (See Exhibits). The 1st accounting accordingly was not approved

by plaintiff's counsel yet was rubber stamped on April 4, 2006 by the Court without

any review or hearing scheduled inspite objections and motions were filed for the same

either overruled or denied. A total failure of due process and abridgment of the plaintiff's

14th Amendment Rights. Consequently, SFI argued that "Dennis Ball is precluded from

challenging that accounting presumably based upon ARS 14-5419 (D). At that time, the

plaintiff was represented by Counsel.(See Objection to Estate Plan). Counsel for

Dennis Ball did not approve the accounting.  Annual accountings of estate assets are

final to the matters therein determined and approval of annual accountings after notice

without appeal is binding in absence of fraudulent concealment or misrepresentations

See: Matter of Terman's Estate 135 Ariz. 453  P 2d 1154 (1983).

88.    In the case of P.K.L. v J. K. S. 189 Ariz 487. 943 P. 2d 847, (1997) the

Court found that the probate court has a duty to review conservator's accounts

for administration of conservatorship estate for any impropriety or unreasonableness

in manner in which protected person's property is being handled to accounted for to

the court. The plaintiff raised questions and issues of fact. The plaintiff is entitled to a

hearing to present evidence proving his claims. The plaintiff requested the Court set

this matter for hearing and was denied. (See Court's Order dated June 8, 2006).

89.    Each denial by the Court official in this case is a predicate act and subject for further review by the District Court and its Probate Exception not less than what the Bankruptcy Court has to do in cases of common law fraud, embezzlement, extortion tortuous interference with inheritances, RICO, Title 42 Section 1983, breach of fiduciary duty, APSA Title 46-456, conversion, constructive trust, violations of due process and 14th amendment rights and Rule 60 (c) considerations.

90.    Common to all Counts, objections by the plaintiff to the Final Accounting of SFI by and through defendant attorney A. Paul Blunt and that of defendant Estate of Jonathan P. Schubert and defendant 1st Mercury Insurance. (both deceased).

91.    There was an implied legal duty placed upon the fiduciary acts by the Court and common to all the defendants.  That duty extended to:

1).  The Cost of Care for the Ward (Eleanor Ball) at Encore Senior Living aka Encore Senior Village was the most expensive residence in Arizona for the type of care she was receiving even though many other locations and service centers existed within a 5 mile radius of her home in Surprise, Arizona.  SFI showed no interest whatever in finding her alternative housing at lesser costs for the going market rate or in bringing her home. After they took her money the defendants put her on ALTCS and owe the State of Arizona $28,000.00 for their predicate acts against the Arizona Long Term Care System (ALTCS).

2).  No Consideration what-so-ever of placing her assets in a Miller's Trust to preserve and protect her assets which she was eligible for Arizona Long Term Care System (ALTCS) related support. Plaintiff's attorney at that time, Nancy D. Peterson objected to the Estate Plan created by SFI and its attorney, A. Paul Blunt.  Deceased attorney, Jonathan P. Schubert was no where to be found with no thought given in preserving the assets of the trust and estate of Eleanor R. Ball in November 2004.

3).  Personal property of Eleanor R. Ball abandoned by defendants SFI & Morgan Stanley [Trust] causing injury to the assets within the Trust and Estate of Elenaor Ball and jeopardizing those assets and allowing further

injury by looting the trust liquidity and allowing other 3rd parties to gain
control of those assets including Mid-Country Bank, Metropolis, IL.

4). The fiduciary helping themselves to the Trust's Liquidity of Eleanor Ball,
on a pre-payment of fees to Encore Senior Living aka Encore Senior
Village on a Court Order gained from the Court with no Discussion of
plaintiff's counsel, Nancy D. Petersen on October 20, 2004 looting the
Trust Liquidity with Morgan Stanley <u>assisting</u> providing no objection or
legal counsel to stop the hemorraging of Eleanor Ball's Trust Liquidity
and property. The check was made to SFI instead to Encore Senior Living
$29, 052.00. at a cost 4 times the going rate for assisted living facilities
for a 6 month period and Morgan Stanley [Trust] let them do it. The
plaintiff has been damaged and the nursing home was paid with a
duplicate check for the same amount of $29,052.00.

5). While SFI was having a pigfest on Elenanor's Trust, her Illinois property
was being unprotected, lived in for free, damaged, and given away for
nothing. The defendants were noticed and so was the Court. No body
did anything to remedy the problem until the Plaintiff Stepped In to stop
the bleeding. Now, the defendants are liable for all the predicate acts
created in the Bankruptcy Court and will be required to compensate
the Trust and account for them. The Plaintiff, Dennis Andrew Ball has
been both damaged and injured by the exploitation of a vulnerable adult
by ARS 46-455, 456 and demands punitive damages with Jury Trial.

6). One only need go to AZCentral.com and type in Probate to bring up all
Stories of Guardianship Abuse by Southwest Fiduciary and the rest of
the Pigs in that business for profit private fiduciarys. There is a Senate
Bill being debated at the time of this filing that has caused all of them to
Sqweel that they may lose their grip on the Market and be forced out
of business by the bad publicity their unlawful and abusive conduct has
shown the Court of Public Opinion.

92.   Defendants John & Jane Does I-X, Black Corporations I-X and White

Partnerships I-X are those persons or entities to the named Defendants/Co-Defendants

or whose acts or omissions gives rise to legal responsibility for the damages incurred by

Eleanor R. Ball and the plaintiff, Dennis Andrew Ball, but whose true identities, are at the

present, unknown by the Plaintiff, Dennis Andrew Ball. These persons thereby are

notified of plaintiff's intention to join them as defendants if and when additional

investigation or discovery reveals the appropriateness of such joinder. This is a disclaimer statement by which the plaintiff is damaged.

93.   All Defendants identified as husband and wife, including Gregory and Peggy Dovico, were at all times mentioned herein, married to eachother and were acting in furtherance of their marital community so that the marital community is liable for the acts therein. Currently any person identified by John or Jane Doe is unidentified but will be noticed upon discovery of their true identity.

94.   SFI was appointed by the Maricopa County Superior Court to provide said guardian, conservator and fiduciary services on behalf of Eleanor Ball and took an Oath, through its owners, Gregory and Peggy Dovico, to act as the guardian and conservator for Eleanor Ball, and "solemnly swore to perform the duties of a fiduciary according to law".

95.   In order for a person to be deemed incapiciated and for another to be appointed as a guardian and conservator, ARS & 14-5303 required a physicians examination supporting the finding of incapacitation along with other important medical information regarding the person including a "prognosis for improvement in the alleged incapacitated person's condition and a recommendation for the most appropriate rehabilitation plan or care plan".

96.   At all times, SFI, Encore Senior Living LLC (ESL) aka Encore Senior Village knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by ARS & 46-451 (A) (9).

97.   Both SFI and ESL aka Encore Senior Village had a duty to support Eleanor Ball in whatever timely and prudent fashion possible for her convelescence and quality

of health as established by Statue , Failure to perform these duties places at risk the Ward and makes the defendants liable for the safety and security of that person.

98.     In order for a person to be deemed incapacitated and for another to be appointed as a guardian and conservator, A.R.S. § 14-5303 requires a physician examination supporting the finding of incapacitation along with other important medical information regarding the person including "A prognosis for improvement in the alleged incapacitated person's condition and a recommendation for the most appropriate rehabilitation plan or care plan".

99.     At all times, SFI, Encore Senior Village aka Encore Senior Living knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by A.R.S. § 46-451 (A) (9).

## LEGAL DUTIES OWING BY SFI AS SERVING AS A  CONSERVATOR, GUARDIAN AND FIDUCIARY FOR ELEANOR R. BALL

100.    At all times mentioned herein, Defendant SFI, and its owners Gregory and Peggy Dovico, (hereinafter "SFI") were certified fiduciaries licensed by the State of Arizona and held themselves out as being competent and capable of managing medical care, welfare and financial matters for Eleanor Ball.

101.    Among the fiduciary duties SFI undertook as the guardian and conservator for Eleanor Ball was to be "responsible" for Mrs. Ball's "care and custody". A.R.S. § 14-5310 (I).

102.    As the certified fiduciary, guardian and conservator for Mrs. Ball, an

incapacitated adult, SFI had the same "duty" respecting Eleanor Ball as a parent

has concerning their minor child. A.R.S. § 14-5312 (A).

103.    As a certified fiduciary, guardian and conservator, SFI owed a duty to

Eleanor Ball to secure appropriate medical and psychological care and social

services. A.R.S. § 14-5312 (A) (9).

104.    As a certified fiduciary, guardian and conservator, SFI had a legal duty to

"take into consideration" Eleanor Ball's "values and wishes" in regard to serving

as Ms. Horrigan's conservator and guardian. A.R.S. § 14-5312 (A) (11).

105.    As a certified fiduciary, guardian and conservator for Eleanor Ball, an

incapacitated adult, SFI had a duty to "exercise care" to "conserve" Eleanor Ball's

"excess" assets for her "needs" as opposed to SFI's own profit motive.  A.R.S. §

14-5312 (A) (4).

106.    As a certified fiduciary, guardian and conservator, SFI owed a duty to

Eleanor Ball to "actively work toward limiting or terminating the guardianship and

seeking alternatives to guardianship". A.R.S. § 14-5312 (A)

107.    Pursuant to A.R.S. § 14-5401 (2) (B), SFI was in part appointed as Eleanor

Ball's conservator to prevent the dissipation of Eleanor Ball's property and funds

which were necessary for her support, care and welfare. This was done despite that

Morgan Stanley [Trust] was her Successor Trustee & Asset Manager lawyer

Schubert.

108.    By agreeing to act as the conservator, SFI was obligated to observe the

standard of care

applicable to trustees in safeguarding Eleanor Ball's property as defined by A.R.S.

§ § 14-10804 and 14-10806. *See* A.R.S. § 14-5417.

109.   The court's appointment of SFI as Eleanor Ball's conservator, did not

transfer to SFI any trust assets or otherwise alienate or void The Eleanor R. Ball

Irrevocable Living Trust 05/10/01, A.R.S. § 14-5420 B.

110..   As a licensed fiduciary and court appointed conservator, SFI owed Eleanor

Ball a legal duty to "expend or distribute sums" reasonably necessary for her care

and benefit "with due regard" to the "size of her estate" and the fact that Eleanor

Ball's incapacitation was permanent and that she would require a conservator and

guardian to manage her business affairs and  pay for her care during the remainder

of her lifetime. A.R.S. § 14-5425 (A) (2).

111.   As a licensed fiduciary and court appointed conservator, SFI had a legal

duty to consider the

The Eleanor R. Ball Irrevocable Trust and Estate plan. A.R.S. § 14-5427.

112.   As the conservator and guardian of Eleanor Ball, SFI had a legal duty to

ensure that Eleanor Ball, as a vulnerable and incapacitated adult, received proper

and adequate medical care and that her health would not be endangered or injured

by the neglect, abuse or exploitation of itself or another.  A.R.S. § 46-555 (A) (B).

113.   As a licensed fiduciary, guardian and conservator, SFI was obligated to

comply with the rules and code of conduct adopted by the Arizona Supreme Courts

to establish minimum standards for certified fiduciaries.  These rules include

AACJ § 7-202 which require fiduciaries to:

      A.     The fiduciary shall make reasonable efforts to determine the preferences of the ward or

      protected person, both past and current, regarding all decisions the fiduciary is empowered to

      make.

      B.     The fiduciary shall make decisions in accordance with the determined preferences of the

      ward or protected person, past or current, in all instances except when the fiduciary is reasonably

      certain the decision will result in substantial harm.

      C.     The fiduciary shall maintain an awareness of their limitations and shall carefully consider

      the views and opinions of those involved in the treatment, care and management of the ward,

      protected person, or estate and shall also seek independent opinions when necessary.

      D.     The fiduciary shall recognize their decisions are open to the scrutiny of other interested

      parties and, consequently, to criticism and challenge.  Regardless, the fiduciary alone is

      ultimately responsible for decisions made on behalf of the ward, protected person, or estate.

      E.     The fiduciary shall refrain from decision making in areas outside the scope of the

      guardianship, or conservatorship, or personal representative order. When necessary and in the

best interests of the ward or protected person, the fiduciary shall assist the ward or protected

person by ensuring decisions are made in an autonomous fashion

114.   As the court appointed guardian, conservator and fiduciary, SFI had a duty to abide by the

probate court rules, including but not limited to the preamble of the rules which provides:

The appointment of a guardian or conservator intrudes on the wards or protected person's liberty to make and carry out decisions regarding matters that may be of a very personal nature. The appointment of a guardian or conservator places the guardian or conservator in a position of trust and confidence with respect to the ward or protected person and imposes on the guardian or conservator the highest duty to act for the benefit of the ward or protected person. For these reasons, these rules also are intended to ensure the protection of the due process rights of persons for whom the appointment of a guardian or conservator is sought. *See Preamble to Arizona Probate Rules and the National Probate Standards adopted by the Arizona Supreme Court in 2001. See Administrative Order 2001-63.*

115.   Beginning in March of 2004,  Jonathan P. Schubert repeatedly informed SFI that Eleanor Ball's legal documents, including the general and medical power of attorney, vested in the plaintiff, Dennis Andrew Ball,  the authority, power and legal duty to make all decisions regarding Eleanor Ball's assets that were placed in the trust as well as all decisions regarding Eleanor Ball's  health care and well being.

116.   Beginning in March 2004, the plaintiff, Dennis Andrew Ball  made repeated demands that SFI honor Eleanor Ball's legal documents, intent and wishes and that

SFI dismiss their petition seeking to make unnecessary decisions regarding Eleanor Ball's medical care, well being and financial matters.

117.    Despite having knowledge of the legal documents and attorney Jonathan Schubert's repeated demands, SFI ignored Eleanor Ball's legal documents and her most fundamental and important rights to have the plaintiff and Morgan Stanley [Trust] control her assets, medical care and well being. Consequentially, the plaintiff is damage.

## LEGAL DUTIES OWING BY ENCORE SENIOR LIVING aka ENCORE SENIOR VILLAGE TO ELEANOR R. BALL

118.    At all times mentioned herein, Encore Senior Living LLC were licensed by the State of Arizona, Department of Health Services, as entities capable of providing "directed care" for vulnerable adults in an assisted living home environment.

119.    "Directed Care Services" is defined by Arizona regulation R9-10-101 as "programs and services, including personal care services, provided to persons who are incapable of recognizing danger, summoning assistance, expressing need or making basic care decisions".

120.    At all times mentioned herein, Defendant Encore Senior Village held themselves out as being competent and qualified to provide directed care services to vulnerable adults in an assisted living home environment.

121.    At all relevant times, Encore Senior Village were obligated to employ,

train, and supervise care providers that would care for Eleanor Ball and strive to attain and maintain the well-being of Eleanor Ball and other patients, as determined by appropriately prepared assessments and individual service plans of care.

122.    At all times mentioned herein, Defendants Encore Senior Living LLC aka Encore Senior Village had a duty to employ sufficient staff and competent care providers in order to provide adequate directed care services and not to under staff its homes or employ incompetent and overworked care providers that would jeopardize the safety of Eleanor Ball and others.

123.    At all times mentioned herein, Defendants Encore Senior Living LLC aka Encore Senior Village had a duty to provide for the safety of their residents, particularly residents who were impaired and in need of special precautions for their safety, by providing each patient with adequate supervision and assistance to prevent injuries or deterioration of their health and to have a system in place that would deliver such care in an efficient manner.

124.    At all times mentioned herein, Defendants Encore Senior Living LLC aka Encore Senior Village had a duty to oversee their respective assisted living homes and to ensure the adequate delivery of healthcare and assistance generally under their operation, including seeing that adequate training, communications, care planning and coordination of services were in place and to intervene when patients' conditions were not being properly attended to.

125.    As a result of Eleanor Ball's diagnosis of general decline in health, dementia and other various health concerns including chronic urinary tract infection, Eleanor Ball required close supervision and monitoring, assistance in eating and dietary planning and medical attention to ensure she had proper nutritional intake and appropriate medications and protection from infection and deconditioning.

126.    Defendants owed Eleanor Ball a variety of duties under federal statutes and regulations, state statutes and regulations and common law.

127.    Among the duties Defendants owed to Eleanor Ball was the duty to report incidents of abuse or neglect as required by A.R.S. § 46-454.

128.    Among the duties Defendants owed to Eleanor Ball was the duty to exercise reasonable care to protect her from nutritional problems, infections and chronic urinary tract infection..

129.    Among the duties Defendants owed to Mrs. Horrigan was the duty to create and maintain accurate records of Eleanor Ball's assessments, condition, history, and nutrition so as to enhance her progress and well being.

130.    Among the duties Defendants owed to Eleanor Ball was the duty to monitor and properly assess her condition, from initial assessment, ongoing assessment, and see to her general health and safety and nutritional needs and to note and report any failure to improve under the therapies ordered.

131.    Among the duties the Defendants, Encore Senior Living LLC aka Encore

Senior Village owed to Eleanor Ball was the duty to timely contact her physicians

to report and changes in her condition.

132.    Among the duties the Defendants owed to Eleanor Ball was the duty to

provide all necessary medical care to ensure Ms. Horrigan's well being. R9-10-

711.

133     Among the duties the Defendants owed to Eleanor Ball was the duty to

properly document all injuries or maladies suffered by Eleanor Ball. R9-10-703.

134.    By contracting for and by accepting  Eleanor Ball  under their care and

supervision, Defendants expressly or impliedly represented to Eleanor Ball and her

guardian, that Defendants and their employees were ready, willing and able to

undertake and carry out the duties enumerated above and others imposed by law.

## SFI, ENCORE SENIOR LIVING aka ENCORE SENIOR VILLAGE FAILURE TO PROVIDE ADEQUATE AND PROPER PERSONAL & MEDICAL CARE.

135.    On or about June 3, 2004,  Eleanor Ball was evaluated by her doctors as

suffering from chronic

Type II bacterial infection due to urinary tract infection resulting from a poor

immune system due to age and

history of previous stroke in 1995 and TIAs that occassionally occurred thereafter

leading to her death on April

28, 2006  at the Encore Senior Village facility where she had a weight of 140

pounds and a diagnosis of dementia and other chronic diseases resulting from her

cardio-vascular issues.

136.   On or about June 21, 2004, based upon the approval and placement by SFI, Eleanor Ball was admitted to Encore Senior Living LLC aka Encore Senior Village.

137.   On or about August 30, 2004, based upon SFI's approval and placement, Eleanor Ball was permanently placed at Encore Senior Living  LLC aka Encore Senior Village, Peoria, Arizona.

138.   Encore Senior Village is a facility owned by Encore Senior Living LLC located at 9150 W. Athens, Peoria, Arizona, which is approved by the Arizona Department of Health Services (ADHS) as an unskilled medical assisted living home facility which can provide "direct care services" for and house between 5-10 persons per Cottage.  There are several Cottages at Encore Senior Village, Peoria, Arizona.

139.   Encore Senior Village is a facility owned and managed by Encore Senior Living that is approved by  the Arizona Department of Health Services as an unskilled medical assisted living home facility which can provide "direct care services" for and house 5-10 persons per Cottage. There are several Cottages present.

140.   In Spite of the Defendants license and certification by the Arizona Department of Health Services both for medical or other training or experience which would qualify them to own and operate their assisted living homes that were

authorized to provide "directed care services" to the persons who were incapable

of recognizing danger, summoning assistance, expressing need or making basic

care decisions.

141.    From September 18, 2004 until April 21, 2010, Encore Senior Village

received at several  citations from the Arizona Department of Health Services

which included the following violations of Arizona laws:

        A.     R9-10-706. E. 3, failure to maintain personnel qualifications and records on site.

        B.     R9-10 .A. 1-11, failure to provide employee orientation and ongoing training.

        C.     R9-10-718 .1. B, failure to abide by environmental regulations.

        D-G.  R9-10-703. B. 2. d., four violations of administration regulations, including failure of

               manager to display certificate, failure to have patient tuberculosis test results, failure to

               have a manager's designated caregiver on duty, failure to document an injury to a patient as

               when Eleanor Ball injured herself and the plaintiff was unable to get a description directly

               from the Care Home rather than through SFI.

        D.     R9-10-706 .E. 1-4, failure to maintain care-giver files.

        E.     R-10-708. A. 1., failure to maintain employee work schedule.

        F.     R9-10-708. B. 1., failure to sign resident agreements for two residents.

        G.     R9-10-709. H. 3., improperly keeping a residents funds for

more than 30 days after the

resident left the facility.

H.    R9-10-710.D.1,  failure to ensure that residents have rights to live in an environment that

promotes and supports each resident's dignity, individuality, independence, self-determination,

privacy, and choice, as required.

I.    R9-10-710.D.4, failure to ensure residents have rights to privacy.

J.    R9-10-711.A.5.b., failure to maintain complete direct service plan.

K-M.  R9-10-713.B.3-6., three violations of medication provisions including failure to maintain

medication records, failure to dispose of expired medications and failure to document the care

giver providing assistance to resident with medications.

N-O.  R9-10-7717.A.3-4., two violations of failure to have fire drills.

P.    R9-10-722-D.1.d., failure to meet medication requirements.

Q.    R9-10-706.A.2.c., failure to have care giver training in first aid documentation.

R.    R9-10-718.1.a., failure to maintain bathtub in good repair.

S.    A.R.S. 36-406.1.d., failure to maintain updated influenza vaccination documentation.

T.    R9-10-703.B.3., failure to maintain TB results for four residents.

U.     R9-10-703.B.9., failure to document employee care giver finger print cards for three

employees including one caregiver.

V.     R9-10-706.A.1, failure to maintain TB test results for a caregiver.

W.     R-9-10-711.A.6.a., failure to have resident sign care plan.

X-Y.  R9-10-713.B.6.b-c., two violations of medication documentation and records.

142    Citations from the Arizona Department of Health Services which included

the following violations of Arizona laws:

A.     R9-10-703.B.3., failure to have TB test results for two residents.

B.     R9-10-711.A.6.A., failure to have an initial service plan for a resident.

C.     R9-10-711.A.6.B., failure to have three resident service plans signed by the manager.

D.     R9-10-713.B.2., failure to have a current drug reference guide book.

E.     R9-10-713.B.6.b., failure to have medication listed on a medication administration record.

F.     R9-10-714.A.2., failure to maintain addresses for four residents.

G.     R9-10-723.E., failure to ensure that doctor's orders are followed for two residents.

H.     R9-10-703.A.9.a., failure to provide immediate access to residents records.

I.     R9-10-706E.1-4., failure to maintain resident records.

J.     R9-10-708.B.1., failure to maintain current employee work schedule.

K.     R9-10-715.A.4., failure to provide meals according to pre-planned menus.

L.     R9-10-723.F., treatment provided to a resident that was not per doctor's order.

M.     R9-10-709.I.1.b., failure to return fees or otherwise provide an accounting within 30 days.

N.     R9-10-703.A.2., failure to have a current manager.

O.     R9-10-703.B.2.b, failure to have current emergency phone numbers.

P.     R9-10-703.B.3., failure to have TB resident test results.

Q.     R9-10-703 B.12.b.i-vi., failure to document resident injury.

R.     R9-10-708.B.1., failure to have employee work schedule.

S.     R9-10-709C.1-2., failure to have residency agreement.

T.     R9-10-709.I.1.c., failure to have resident accounting for deposits.

U.     R9-10-711.A.1-7., failure to have a resident service plan.

V.     R9-10-711.B.2., failure to meet resident needs for failure of getting treatment.

W.     R9-10-713.B.4.a., failure to store resident's medication in a locked cabinet.

X.     R9-10-713.B.6.b., failure to properly document medication on usage on three residents.

Y.     R9-10-715.A.3.a.ii., failure to base menu on Food Guide Pyramid.

Z.     R9-10-716.B.4.a.i., resident window did not provide safe

access in an emergency.

    AA.    Unsupervised resident falls at Encore Senior Village Parking Lot.

    BB.   R9-10-717.A.3., failure to conduct fire drills.

    CC.   R9-10-718.1.a., facility not in good repair (exhaust vent).

    DD.   R9-10-719.A.3., resident door not equipped with device to alert staff of needs.

    EE.   R9-10-719.B.3., fire extinguisher not serviced.

    FF.   R9-10-723.E.., two resident's medications  being provided without a physicians orders.

    II.   R9-10-715.C.4.a., not maintaining potentially hazardous food at 41 degrees Fahrenheit or

    below.

    JJ.   R9-10-716.A.1., failure to comply with fire codes.

    KK.   R9-10-719.A.5.d.iii., failure to ensure that a residents room had a shower curtain.

    LL.   R9-10-719.B.6., failure to ensure that a fire detector was operational.

143.  Based on the number of violations of Arizona regulations and laws, ESV

license to operate

SHOULD BE SUSPENDED to a provisional license.

144.  Failure to document accident, incidents or injuries of a resident; Failure to

ensure a residents needs were met; Failure to ensure a resident's medications were

provided based on a physician's order and Failure at all times to ensure that the

facility had a manager.

145.    Encore Senior Village  was operated and managed by Encore Senior Living.

146.    Encore Senior Village was a non-skilled facility which did not have the

appropriate medical facilities and competent staff to care for Eleanor Ball based on

her diagnosis of suffering from a history of critical stroke, infectious diseases and

chronic urinary tract infection with dementia and associated mental illness.

147.    Prior to the probate, conservator and guardian proceedings being initiated

regarding Eleanor Ball,

her estranged daughter, Carol L. Ball had not spoken with Eleanor Ball for several

years.

148.    Eleanor Ball, through legally executed documents including her will, trust,

and power of attorney, and through her primary care physician, Dr. Stephen

McRunels , had made her intent and wishes clear that she did not want her

estranged daughter, Carol L. Ball, to be in charge of her medial care and

wellbeing.

149.    Despite Eleanor Ball's clear intent not to be under the care of her estranged

daughter Carol

Ball,  SFI placed Eleanor Ball at Encore Senior Village and essentially
       forced her to be under the care

and supervision of her estranged daughter, Carol L. Ball and reside with
       strangers after expressing her

need to return home to her familiar and comfortable surroundings and
       loving care.

150.   The plaintiff and his mother, told SFI that Eleanor Ball should not be placed

in a facility but rather place her home away from her estranged daughter and

occupied that upset her as this would create a danger to

Eleanor Ball  and cause her to suffer severe mental distress.

151.   During the time Eleanor Ball resided at Encore Senior Village,  Eleanor

Ball was subject to repeated abuse and neglect by her estranged daughter and other

ESV Staff including caregivers always attempting to seperate loved ones from

each other.

152.    The abuse Carol L. Ball and others engaged in included threatening

Eleanor Ball, displacing or hiding Eleanor Ball's personal items from her and

moving her from room to room in the facility to confuse and cause Eleanor Ball to

suffer mental distress. This is a violation of SFI duty to protect their client from the

abusive behavior of the disinherited daughter.

153.    SFI,  Encore Senior Living aka Encore Senior Village  "implemented"

visitation restrictions and deprived Eleanor Ball til the end of her life the

fundamental right to visit with the plaintiff despite a Court Order

granting the plaintiff that right, who in fact was the person appointed by Eleanor

Ball to manage her medical care and wellbeing and had done just that prior to her

being declared a Ward of the Court, August 30, 2004.

154.   Employees of Encore Senior Village recorded erroneous and false

information in Eleanor Ball's care records.

155.    Based upon SFI and Encore Senior Village's neglect and lack of appropriate medical care, Eleanor Ball continued to suffer multiple urinary tract infections, tremors and shaking and was taken by emergency transport for evaluations by emergency room staff then returned without treatment or medications.

156.    Effectively, SFI and owners Gregory & Peggy Dovico gave Eleanor Ball a death sentence leaving

her unattended in unpleasant surroundings she did not like and was virtually held as a prisoner by a system

that preys on the Vulnerable for everything they have, own or attached in their life. It is barbaric and

inhuman worse than what a street dog or alley cat has to endure. Eleanor Ball was confined to a hospital wheel chair and she was no longer able to walk, speak, eat, drink or perform activities of daily living at her death.

157.    Despite Eleanor Ball's dire condition and need of skilled medical care, SFI kept Eleanor Ball at Encore Senior Village which was unable to provide the skilled medical care required by Eleanor Ball.

158.    Despite being wholly unable to provide the medical services and equipment required to care for Eleanor Ball, Encore Senior Village accepted her as a patient.

159.    Despite Eleanor Ball's dire condition and the complaints of the plaintiff,

SFI failed to timely transfer Eleanor Ball to a skilled medical facility that could adequately care for her dire condition.

160.    When Area Agency on Aging was finally called to visit with Eleanor Ball, she was so drugged

she could not recognize the voice of the plaintiff in two phone calls held to her ear by the investigator nor was

she allowed to contact the plaintiff by the cruel and inhuman staff at the facility. Despite repeated attempts to

have proper contact and visitation with plaintiff's mother, Eleanor Ball, plaintiff was denied all contact with her

at the facility and by the owners of SFI.  The plaintiff has been damaged A.R.S. & 46-455. punitive damages.

161.    Inspite of Eleanor Ball's repeated requests to visit with the plaintiff, she too was denied by both SFI and Encore Senior Village using Eleanor Ball's money as a pigfest on her trust and husband's assets they worked a life time to accumulate. The plaintiff has been damaged during the time of the appointment of Encore Senior Living aka Encore Senior Village. Staff FAILED TO SUPERVISE dangerous and threatening residents.

162.    SFI and Encore Senior Living failed to report to the Adult Protective Services that Eleanor Ball was a victim of abuse and neglect by staff at Encore Senior Village as required by A.R.S. 46-544. Encore Senior

Village allowed "crazies" to intermingle with less disturbed individuals and to be a

threat when interfaced with

family visitations of their loved ones.  As a consequence of repeated incidents of

residence abuse, both the mother and plaintiff where damaged by the Staff and

residence at Encore Senior Living aka Encore Senior Living and caused both to

lose contact with eachother inspite that the law provided otherwise. The plaintiff

has been damaged.

163.    Encore Senior Village failed to document Eleanor Ball's injuries as

required by R9-10-703.

164.    Finally, in February 2005, Eleanor Ball was admitted to a skilled nursing

facility at Sierra Winds Rehabilatation and Skilled Nursing Center, Peoria,

Arizona.

165.    Upon her admission to Sierra Winds, Eleanor Ball was dehydrated,

suffering from malnutrition, and her condition was unclear despite that she had

been billed at the maximum rate to loot her resources and

make her dependent upon the State Welfare Program by Southwest Fiduciary, Inc.

and owners Gregory and Peggy Dovico.

166.    Based upon the extreme neglect of SFI and Encore Senior Village, Eleanor

Ball's condition took

weeks and months to cause her to lose hope of contact with the plaintiff coupled

with the drug doses to cause

her to be comotozed she became severely depressed to the point she suffered a

massive heart attack on April

28, 2006 and subsequently did die from the gross abuse of her protectors!  The

plaintiff has been damaged.

167.     Based upon the extreme neglect of SFI and Encore Senior Living aka

Encore Senior Village,  Eleanor Ball was admitted at the Boswell Hospital, Sun

City, Arizona on April 27, 2006 and died April 28,

2006.  Both SFI and Encore Senior Village played key roles in the premature death

of Eleanor R. Ball. The

plaintiff has been damaged and seeks relief by the cause of actions (Counts) by the

defendants.


**(Abuse and Neglect of a Vulnerable adult in Violation of A.R.S. §§ 46-454 and
46-455 against Southwest Fiduciary, Inc.,  Gregory P. & Peggy Dovico And
Encore Senior Living aka Encore Senior Village)**

168.     Plaintiff incorporates all allegations set forth above as though fully set forth

herein.

169.     During the time Eleanor Ball resided at Encore Senior Village, she suffered

from Dimentia and other mental health disorders all of which required proper

assessment, care planning, dietary and nutritional intervention to assist her in

overcoming infection and otherwise thriving to the restoration of her health and

general well being.

170.    Defendants SFI, Encore Senior Living aka Encore Senior Village failed to properly assess and diagnose the conditions of Eleanor Ball or develop an appropriate service and nutrition plan to enhance her health and address those conditions from which she suffered. Information was totally controlled by them.

171.    Defendants failed to follow physicians' orders concerning Eleanor Ball's nutrition, diet and psychiatric care.

172.    Defendants failed to monitor Eleanor Ball's failing health generally or advocate for treatment she required.

173.    Encore Senior Living aka Encore Senior Village was not qualified or capable of providing the proper care and treatment for Eleanor Ball given her severe mental illnesses and propensity for infection and a general decline in her health and should not have accepted her, particularly after Eleanor Ball was hospitalized at

Arrowhead Hospital in June of 2004. By February 2005, she had been admitted due to nursing home negligence

at Sierra Winds after a brief stay at Banner Del Webb Hospital, Sun City West, Arizona.

174.    Defendants failed to recommend and schedule appointments and examinations by nurses, physicians and psychiatrists in order for Eleanor Ball to maintain her health and well being and avoid a deterioration and general decline in her health and well being including proper contact with loved ones.

175.   Defendants had an obligation to ensure that Eleanor Ball engaged in physical exercise and received adequate nutrition and hydration so that she would not become deconditioned and suffer a decline in her general health that would make her susceptible to disease and death.

176.   The above described negligence, breaches, abuse and neglect resulted, in part, from a lack of adequate supervision resulting in her fall resulting in her hospitalization for hip fracture in February 2005.

177.   The above described negligence, breaches, abuse, and neglect resulted, in part, from a lack of adequate training of and care by food service personnel and others attending to the care of Eleanor Ball who failed to properly assess her needs, carry out orders, monitor her condition, feed her adequate nutrition, order appropriate tests and consultations and otherwise provide for her needs including having proper contact and visitation with the plaintiff.

178.   The above described negligence, breaches, abuse, and neglect caused Eleanor Ball to suffer

severe and permanent damage to her physical body and mental state by familial separation of loved ones.

179.   The above described negligence, breaches, abuse and neglect proximately caused Eleanor Ball

to suffer continuing illness, lack of nutrition, spread of infection and general deterioration, with consequent physical and mental suffering. The isolation,

medication, liquidation and termination by drugs caused her death.

180.   As a result of Defendant's negligence and violation of A.R.S. §§ 46-454 and 46-455, Eleanor Ball  was hospitalized for a bone fracture of the hip which required skilled nursing rehabilitation before she could return back to her Peoria, Arizona residence while incurring substantial medical expenses.

181.   Based on the foregoing allegations, Defendants had a reasonable basis to suspect that Eleanor Ball  was a victim of abuse or neglect, as defined by A.R.S. § 46- 451 et seq.

182.   Defendants did not report that Eleanor Ball was a victim of abuse or neglect, as defined by A.R.S. § 46-451.

183.   By failing to report that Eleanor Ball was a victim of abuse and neglect, as required by A.R.S. § 46-454, Defendants permitted such abuse and neglect to continue, resulting in the endangerment of Eleanor Ball.

184.   The acts and omissions of Defendants constitute negligence and a breach of the above enumerated duties and a deviation from the appropriate standard of care in reckless disregard of the needs of Eleanor Ball constituting the abuse and neglect of a vulnerable adult as defined by and giving rise to a cause of action under § 46-455, and justifying an award of compensatory damages, attorney fees and related expenses.

185.   The above-described breaches, abuse and neglect, are representative of a pattern of abuse and neglect of incapacitated and vulnerable adults as evidenced by

previous incidents, lack of appropriate staffing, and on-going patterns of abuse and/or neglect as those terms are defined by A.R.S. §46-451, justifying investigation by the Court and Plaintiff into the operations and pattern of abuse and neglect of other patients and justifying an award of damages, compensatory and punitive, and such other penalties, injunctions and orders as the Court deems appropriate.

## FINANCIAL EXPLOITATION AND BREACH OF FIDUCIARY DUTIES AGAINST SOUTHWEST FIDUCIARY, GREGORY P. & PEGGY ANN DOVICO.

186.   SFI and Gregory and Peggy Dovico ignored Eleanor Ball's legal documents, the demands from the plaintiff and Eleanor Ball's fundamental rights of liberty and due process for the selfish purpose and motive of earning substantial and excessive profits for managing Eleanor Ball's estate and medical care.

187.   Upon taking over Eleanor Ball's property, SFI wrote to the plaintiff advising that he was not permitted on the property of Eleanor Ball's three homes, in total disregard of Eleanor Ball's trust making

Morgan Stanley Dean Whitter the legal trustee of her Illinois property and commercial property.

188.   As a result of SFI ignoring Eleanor Ball's directives, legal documents and fundamental rights, SFI ran up substantial and excessive "fiduciary" fees, legal fees and costs in serving as Eleanor Ball's "conservator" and "guardian" in the

amount of at least $190,000 in 22 months of their appointment.

189.   The $190.000 in excessive fees resulting from SFI serving as Eleanor Ball's "conservator" and "guardian" did not include the costs of Eleanor Ball's medical care and was only for fees charged by SFI and the attorneys hired by SFI in managing Eleanor Ball's estate, trust assets and medical care, all against the wishes of

Eleanor Ball and the plaintiff while Morgan Stanley [Trust] stood by silently as the Successor and Acting trustee.

190.   While acting as Eleanor Ball's conservator, SFI only had the legal right and authority to manage an account for Eleanor Ball's conservatorship or estate assets and did not have the legal right or authority to manage, convert or account for Eleanor Ball's trust property over which Morgan Stanley [Trust] was the successor trustee. (Dennis Andrew Ball is now the sole trustee).

191.   Despite the clear and unambiguous legal documents showing Eleanor Ball's intent that her trust assets be managed by Morgan Stanley [Trust], SFI failed to honor Eleanor Ball's trust and intent and essentially converted all of Eleanor Ball's trust property into conservatorship or estate assets in spite of Morgan Stanley.

192.   During the time SFI converted and exercised control of Eleanor Ball's trust property, SFI failed to pay Eleanor Ball's mortgage payment, electric bills, water bills and other expenses relating to her three Illinois and one Arizona homes.

193.   As a result of SFI's failure to pay Eleanor Ball's mortgages, taxes, insurance

and utility bills, Eleanor Ball's homes went into foreclosure and her utilities were turned off at her residence resulting in significant unnecessary expenses while the plaintiff could not get Morgan Stanley [Trust] to do anything.

194.   At the same time SFI was refusing to pay Eleanor Ball's  mortgage payment and utility bills and allowing her homes to go into foreclosure, SFI paid itself $56,650.15 on December 9, 2004, paid its attorneys $65,000.00 on December 4, 2004,(Blunt & Associates), and paid the court appointed attorney $35,149.00. (Jonathan P. Schubert, PC).

195.   SFI paid itself and the attorneys out of a restricted account without first obtaining court approval.

196.   SFI paid itself from Eleanor Ball's trust funds over which it had no legal right or control thereby amounting to the conversion of said funds for its own benefit.

197.   In an attempt to hide its excessive fees and malfeasance in the "management" of  Eleanor Ball's estate and medial care, SFI prepared an accounting and submitted it to the Maricopa County Superior Court which reported that Eleanor Ball's estate assets were $212,000.00 when if fact they were approximately $0.00

198.   SFI's first and final accounting further misrepresented that at the time it was appointed conservator on August 16, 2004, that Eleanor Ball's real property (three homes) were "estate" assets that should be included in SFI's first and final

accountings when in fact Eleanor Ball's real property was transferred into her living trust on May 10, 2001 well outside the window of SFI's appointment and with no authority to negotiate trust assets.

199.   SFI "raided" Eleanor Ball's Illinois homes and land interests her Arizona property gave away for nothing a free and clear property and allowed to be sold her commercial land interest for nothing while self paying and dealing her valuable personal liquidity by marshalling all her assets into the pockets of SFI and their attorneys namely that of Arthur Paul Blunt, Kevin Rattay and Court Appointed attorney, Jonathan P. Schubert which together they converted all her assets and property for their own benefit.

200.   The valuable personal property which SFI intended to remove from Eleanor Ball's residence was trust property over which it had no legal right or authority.

201.   Despite explicit instructions from Dennis Ball for SFI not to enter in the home of his mother he lived and was titled ownership, SFI ignored his requests, video taped all of his possessions and changed the door locks without his consent resulting in a Police Investigation by the Surprise Police and City Attorney's Office for invasion of privacy and other crimes they had committed. Breaking and entering is felony flight punishable by criminal law and incarceration.

202.   As an example of SFI's excessive and exorbitant fees, SFI charged Eleanor

Ball $50.00 per hour to open her mail and perform other simple tasks.

203.    A substantial amount of the excessive fees charged by SFI were expended in justifying and concealing its spending and preparing the misleading accounting.

204.    In an effort to run up exorbitant and excessive fiduciary fees, SFI routinely initiates and/or encourages family members to fight among themselves over control of the estate or decisions regarding the care and wellbeing of a vulnerable or incapacitated adult.

205.    Southwest Fiduciary and its attorneys initiated and/or encouraged Dennis and Carol Ball to fight against each so that SFI could serve as joint trustees and guardians and so that SFI could continue to serve in this capacity and charge the estate excessive and exorbitant fees while Morgan Stanley [Trust] passively looked on allowing SFI to usurp their authority regarding the care and protections of Eleanor Ball's asset management.

206.    By refusing Eleanor Ball and the plaintiff Dennis Ball of their fundamental rights to visit with each other, SFI isolated Eleanor Ball from her child and trustee in order to continue their plan of charging  excessive fees and essentially converting Eleanor Ball's assets for its own use.

207.    SFI has engaged in a pattern and practice of depriving vulnerable and/or incapacitated adults and of their property, liberty, due process and other fundamental rights by improperly charging excessive "fiduciary" fees, legal fees

and other costs in serving as the "conservator" and "guardian" for vulnerable or incapacitated person. This practice is part of the RICO or Racketeering Interstate Corrupt Organizations Act.

208.   For example, SFI took over as the guardian and conservator for Eleanor Ball, a vulnerable and incapacitated adult, and in twenty-two months ran up fiduciary and attorney fees of $135,000.00, sold the family home and essentially wiped out her life savings, gave away valuable commercial property for nothing over $1 million dollars worth. Knowing how much the estate is worth is the target to pick it apart and profit from the assets until it has been depleted and drained dry with the health care burden then placed on the taxpayers.

209.   SFI further denied in whole or part visits from Mr. Ball to his mother, Eleanor Ball, to isolate her so that SFI could continue to run up excessive and exorbitant fees.

210.   During the guardianship, SFI paid itself $56,000.00 out of Eleanor Ball's estate while at the same time refusing to pay the taxes, mortgages, insurance and refusing to collect rent on her Illinois and Arizona properties. Then allows the State of Arizona to pay $28,000.00 in ALTC nursing home fees after sacking her estate and trust.  This is exploitation of a vulnerable adult consistent by ARS 46-455 with punitive damages.

211.   As another example, SFI took over as the guardian of Hilga Mallett , a vulnerable and incapacitated adult, and charged her hundreds of thousands of

dollars and is partly responsible for wiping out her $1 million dollar estate to the point where Ms. Mallet is now indigent and her health care is paid for by the State of Arizona long term healthcare program, ALTCS.

212.    SFI and Dovico defendants pattern and practice of consciously depriving vulnerable and incapacitated adults of their property, due process, liberty and other fundamental rights justifies an award of punitive damages against these defendants in an amount that is sufficient to deter them and others from acting in such an egregious and criminal manner and consistent with the filing of Rule 8 (b), plaintiff has been damaged.

        **WHEREFORE**, Plaintiff, prays for judgment against Defendants, severally and jointly, for the following:

    A.    For compensatory damages in a reasonable and appropriate amount;

    B.    For exemplary or punitive damages in an amount sufficient to adequately deter defendants from engaging in such egregious conduct;

    C.    For Plaintiffs' costs and expenses for prosecuting this matter;

    D.    For Plaintiffs' reasonable attorneys' fees pursuant to A.R.S. §46-455 and other statutes;

    E.    For such further relief, orders and injunctions as the Court deems appropriate;

## DEMAND FOR JURY TRIAL

In order for a person to be deemed incapacitated and for another to be appointed as a guardian and conservator, A.R.S. § 14-5303 requires a physician examination supporting the finding of incapacitation along with other important medical information regarding the person including "A prognosis for improvement in the alleged incapacitated person's condition and a recommendation for the most appropriate rehabilitation plan or care plan".

At all times, SFI, Encore Senior Village aka Encore Senior Living knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by A.R.S. § 46-451 (A) (9).

## LEGAL DUTIES OWING BY THE DEFENDANTS KNOWN AS THE ESTATE OF JONATHAN P. SCHUBERT AND 1ST MERCURY INSURANCE SERVING AS THE COURT APPOINTED ATTORNEY AND SURETY FOR ELEANOR R. BALL

213.   At all times mentioned herein, Court Appointed attorney, Jonathan P. Schubert was a licensed attorney practicing law within the State Bar of Arizona holding himself out as being competent and capable of representing the legal ease of his vulnerable adult clients and their financial liquidity and property.

214.   Among the fiduciary duties he took as her attorney and counselor for Eleanor Ball was to be "responsible" for Mrs. Ball's "desires and wishes she had created prior to his Court Appointment".

215.   As a certified estate & trust specialist for Eleanor Ball, an incapacitated adult, Schubert's duty

was the same "duty" respecting Eleanor Ball as an attorney-client relationship by

ethics Rule 42 ARS not to

overbill for his time, counsel or actions that could damage her position or for those

not looking in her best interests to do the same. However, this did not happen

during his appointment resulting in her estate and trust

being severely damaged and injured. It also resulted in emotional deprivation by

actively participating in separating her family toward the end of her life. Schubert

participated in psycological terror of the Ward prior

to his own death on December 23, 2006. This is significant because of the time

that was allowed to pass prior

to the death of Eleanor Ball on April 28, 2006, almost the same amount of time the

plaintiff lost from being able to contact his mother within the last 8 months of her

life.

216.   As a certified specialist Schubert had a duty to insure the comfort, care and

support for his client including her emotional and physical welfare and if he

thought or had knowledge of the lack there of, he had

a duty to report it. That did happen in spite of numerous requests for the Maricopa

County Public Fiduciary

to intervene into the case due to the guardian and conservator abuse by SFI and

their defendant owners Gregory & Peggy Ann Dovico owed to an incapacitated

and vulnerable adult as defined by law with a duty to Eleanor Ball to secure

appropriate medical and psychological care and social services. A.R.S. § 14-5312

(A) (9). This also did not happen during his watch that ultimately led to her death

and wasting away of her and her husband's legacy

by those that participated in the Enterprise under the RICO statues, Civil Rights

Statues, Breach of Fiduciary Duty Statues, APSA- Title 46-455-456 Statues,

Constructive Trust, Tortuous Interference With Inheritances, Violations of 14th

Amendment Due Process and Invalidation of State Court Orders due to Common

Law Fraud

and Racketeering by all of the Defendants.

217.   As a certified estate and trust specialist, Jonathan Schubert had a legal duty

to "take into consideration" Eleanor Ball's "values and wishes" in regard to

serving as her court appointed counsel. This

also did not happen because of her wishes to return home after her brief

hospitalization in June 2004.

218.   As a certified estate & trust specialist for Eleanor Ball, an incapacitated

adult, Schubert had a duty to "exercise care" to "conserve" Eleanor Ball's "excess"

assets for her "needs" as opposed to SFI's own profit motive.  A.R.S. § 14-5312

(A) (4).  His failure to act and protect her from vulnerable adult exploitation was a

breach of his duty to "exercise care" to "conserve" the assets placed in the care of

Morgan Stanley [Trust]. His

failure to return her home to the plaintiff's care costing and bilking out her trust

and estate as the alternative   was unnecessary and criminal.  Schubert allowed the entire estate and trust to fall in disarray by audit over $1,000,000 in actual damages and is eligible for treble damages by statue ARS 46-455-466.

219.   As a certified estate and trust specialist, Schubert owed a duty to Eleanor Ball to "actively work toward limiting or terminating the guardianship and seeking alternatives to guardianship".  A.R.S. § 14-5312 (A) (7).  That also did not happen nor was he interested in communicating with the plaintiff about his mother's care.

220.   Pursuant to A.R.S. § 14-5401 (2) (B), SFI was in part appointed as Eleanor Ball's conservator to prevent the dissipation of Eleanor Ball's property and funds which were necessary for her support, care and welfare.  This was done despite that Morgan Stanley [Trust] was her Successor Trustee & Asset Manager.

221.   By agreeing to act as the conservator, SFI was obligated to observe the standard of care

applicable to trustees in safeguarding Eleanor Ball's property as defined by A.R.S. § § 14-10804 and 14-10806.  *See* A.R.S.  § 14-5417.  Schubert did not participate in the activities of SFI therefore allowing them free reign.

222.   The court's appointment of SFI as Eleanor Ball's conservator, did not transfer to SFI any trust assets or otherwise alienate or void The Eleanor R. Ball Irrevocable Living Trust 05/10/01, A.R.S. § 14-5420 B.

223.   As a licensed fiduciary and court appointed conservator, SFI owed Eleanor Ball a legal duty to "expend or distribute sums" reasonably necessary for her care

and benefit "with due regard" to the "size of her estate" and the fact that Eleanor Ball's incapacitation was permanent and that she would require a conservator and guardian to manage her business affairs and pay for her care during the remainder of her lifetime. A.R.S. § 14-5425 (A) (2). Schubert allowed defendants Dovico, Blunt, Encore Senior Living, Morgan Stanley [Trust] to bill

and expend unreasonable and excessive fees at the cost and expense of his client without her input or consent.

224.   As a licensed estate and trust specialist, defendants, The Estate of Jonathan P. Schubert and 1st Mercury Insurance (surety) caused the demise of the trust and estate of their client, Eleanor R. Ball and the Eleanor R. Ball Irrevocable Living Trust Schubert had a legal duty to consider an honor The Eleanor R. Ball Irrevocable Trust and Estate plan. That did not happen. As a result, the plaintiff has been damaged.  As a result

of allowing all of the defendants to raid the trust and estate without care or consideration of his client, the following happened:

225.   As the conservator and guardian of Eleanor Ball, SFI had a legal duty to ensure that Eleanor Ball, as a vulnerable and incapacitated adult, received proper and adequate medical care and that her health would not be endangered or injured by the neglect, abuse or exploitation of itself or another.  A.R.S. § 46-555 (A) (B).

226.   As a licensed fiduciary, guardian and conservator, SFI was obligated to comply with the rules and code of conduct adopted by the Arizona Supreme Courts

to establish minimum standards for certified fiduciaries.  These rules include
AACJ § 7-202 which require fiduciaries to:

    A.    The fiduciary shall make reasonable efforts to determine the preferences of the ward or

    protected person, both past and current, regarding all decisions the fiduciary is empowered

    to make.

    B.    The fiduciary shall make decisions in accordance with the determined preferences of the

    ward or protected person, past or current, in all instances except when the fiduciary is

    reasonably  certain the decision will result in substantial harm.

    C.    The fiduciary shall maintain an awareness of their limitations and shall carefully consider

    the views and opinions of those involved in the treatment, care and management of the

    ward, protected person, or estate and shall also seek independent opinions when

    necessary.

    D.    The fiduciary shall recognize their decisions are open to the scrutiny of other interested

    parties and, consequently, to criticism and challenge. Regardless, the fiduciary alone is

    ultimately responsible for decisions made on behalf of the ward, protected person, or

    estate.

E.        The fiduciary shall refrain from decision making in areas outside the scope of the

guardianship, or conservatorship, or personal representative order.   When necessary and

in the best interests of the ward or protected person, the fiduciary shall assist the ward or

protected person by ensuring decisions are made in an autonomous fashion.

As the court appointed guardian, conservator and fiduciary, SFI had a duty to abide by the

probate court rules, including but not limited to the preamble of the rules which

provides:

The appointment of a guardian or conservator intrudes on the wards or protected

person's liberty to make and carry out decisions regarding matters that may be of a

very personal nature. The appointment of a guardian or conservator places the

guardian or conservator in a position of trust and confidence with respect to the

ward or protected person and imposes on the guardian or conservator the highest

duty to act for the benefit of the ward or protected person. For these reasons,

these

rules also are intended to ensure the protection of the due process rights of

persons for whom the appointment of a guardian or conservator is sought. *See*

*Preamble to Arizona Probate Rules and the National Probate Standards*

*adopted by the Arizona Supreme Court in 2001. See Administrative Order*

*2001-63.*

227.   Beginning in March of 2004,  Jonathan P. Schubert repeatedly informed SFI that Eleanor Ball's legal documents, including the general and medical power of attorney, vested in the plaintiff, Dennis Andrew Ball,  the authority, power and legal duty to make all decisions regarding Eleanor Ball's assets that were placed in the trust as well as all decisions regarding Eleanor Ball's  health care and well being.

228.   Beginning in March 2004, the plaintiff, Dennis Andrew Ball  made repeated demands that SFI honor Eleanor Ball's legal documents, intent and wishes and that SFI dismiss their petition seeking to make unnecessary decisions regarding Eleanor Ball's  medical care, well being and financial matters.

229.   Despite having knowledge of the legal documents attorney Jonathan P. Schubert ignored them, SFI ignored Eleanor Ball's legal documents and her most fundamental and important rights to have the plaintiff and Morgan Stanley [Trust] control her assets, medical care and well being.  As a result the plaintiff is damaged.

fiduciary

In order for a person to be deemed incapacitated and for another to be appointed as a guardian and conservator, A.R.S. § 14-5303 requires a physician examination supporting the finding of incapacitation along with other important medical information regarding the person including "A prognosis for improvement in the alleged incapacitated person's condition and a recommendation for the most appropriate rehabilitation plan or care plan".

At all times, SFI, Encore Senior Village aka Encore Senior Living knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by A.R.S. § 46-451 (A) (9).

## LEGAL DUTIES OWING BY MORGAN STANLEY [TRUST] IN SERVING AS THE SUCCESSOR TRUSTEE FOR ELEANOR R. BALL AND THE ELEANOR R. BALL IRREVOCABLE TRUST

230.   At all times mentioned herein, Defendant Morgan Stanley [Trust] ,its officers, agents and contractors, who were acting within the course and scope of their employment and authority, and acting as

an Enterprise as referred to in A.R.S. & 46-451(Q), such that this entity is bound by, and vicariously liable for

their own negligence, recklessness, and other tortious conduct in the hiring, training and supervision of the officers, employees, agents and contrators whose conduct gives rise to this action licensed by the State of Arizona and held themselves out as being competent and capable of managing her trust assets,

income, property

and her welfare and financial matters for Eleanor Ball and that of her beneficiary

and plaintiff, Dennis Andrew Ball.

231.   Among the fiduciary duties Morgan Stanley [Trust]  undertook as the

Successor Trustee and asset manager for Eleanor Ball and her trust assets was

"duty to loyalty" to administer the trust <u>solely in the interests</u>

<u>of the beneficiaries</u>. A.R.S. & 14-10802.

232.   As the Successor Trustee and asset manager for Eleanor Ball, an

incapacitated adult, Morgan Stanley [Trust]  had a "duty" respecting  Eleanor Ball

and her trust property to control and protect it as a parent

would for a minor child. A.R.S. & 14-10809.   Their acceptance of the trust and

asset management was finalized by written acceptance in 1999 and 2004 and

affirmed by deposition on June 8, 2004 at the law offices of A. Paul Blunt with

attending officers of Morgan Stanley [Trust] acknowledging care and control of

the assets of their client, Eleanor R. Ball and the Eleanor R. Ball Irrevocable

Living Trust 05/10/01. Upon investigation by audit,

this did not happen during the time of their contract resulting that the plaintiff has

been damaged.

233.   As the Successor Trustee and asset manager, Morgan Stanley [Trust] owed

a <u>duty to inform and</u>

<u>report A.R.S.  & 14-10813A- Unless the trust instrument provides otherwise, a</u>

<u>trustee shall keep the qualified</u>

<u>beneficiaries of the trust reasonably informed about the administration of the trust</u>

<u>and of the material facts</u>

<u>necessary for them to protect their interests.</u> Upon investigation by audit, this did not happen during the time of

their contract resulting that the plaintiff has been damaged.

234.   As the Successor Trustee and asset manager, Morgan Stanley [Trust] breached their contract and had a legal duty regarding <u>Specific power of trustee,</u> A.R.S. & 14-10816 Subsection 11: <u>insure the property of</u> <u>the trust against damage or loss.</u> It is well documented that Morgan Stanley [Trust] failed to to insure or inquire

in maintaining the value of their Client's trust property for the benefit of the beneficiary and plaintiff, Dennis

Andrew Ball.  <u>Deliberate Indifference</u> is the operative word resulting upon investgation by audit to place at risk the assets that the beneficiary had well preserved for the enjoyment of their client prior to her death. Upon investigation by audit and during the time of their contract, the plaintiff has been damaged by their negligence.

235.   As the Successor Trustee and asset manager for Eleanor Ball, an incapacitated adult, Morgan Stanley [Trust] had a duty to "exercise care" to "conserve" Eleanor Ball's "excess" assets for her "needs" as opposed to SFI's own

profit motive. A.R.S. § 14-5312 (A) (4).  Subsections 14-15 of A.R.S. & 14-10816,

point out the Successor Trustee's duty to contest any claim, settle a claim by or against the trust and release

in whole or in part a claim belonging to the trust and to pay taxes, assessments, compensation etc.including

subsection 16-failure to pay taxes with respect to federal, state and local taxes as evidence of malfeasance.

Upon investigation by audit and during the time of their contract, the plaintiff has been damaged.

236.    As a certified fiduciary, guardian and conservator, SFI owed a duty to Eleanor Ball to "actively work toward limiting or terminating the guardianship and seeking alternatives to guardianship". A.R.S. § 14-5312 (A) (7). Morgan Stanley [Trust] had a duty to resolve, prosecute sign and deliver contracts but instead allowed "errors" and "ommissions" of these important duties to be  abandoned by their officers and agents.

A.R.S. & 14-10816 Subsections 23-25. Upon investigation by audit and during the time of their contract, the plaintiff has been damaged.

237.    Pursuant to A.R.S. § 14-5401 (2) (B), SFI was in part appointed as Eleanor Ball's conservator to prevent the dissipation of Eleanor Ball's property and funds which were necessary for her support, care and welfare. This was done despite that

Morgan Stanley [Trust] was her Successor Trustee & Asset Manager.

238.   By agreeing to act as the conservator, SFI was obligated to observe the

standard of care

applicable to trustees in safeguarding Eleanor Ball's property as defined by A.R.S.

§ § 14-10804 and 14-10806.  *See* A.R.S.  § 14-5417. This was also true for the

Successor Trustee, Morgan Stanley [Trust].

239.   The court's appointment of SFI as Eleanor Ball's conservator, did not

transfer to SFI any trust assets or otherwise alienate or void The Eleanor R. Ball

Irrevocable Living Trust 05/10/01, A.R.S. § 14-5420 B.

240.   As a licensed fiduciary and court appointed conservator, SFI owed Eleanor

Ball a legal duty to "expend or distribute sums" reasonably necessary for her care

and benefit "with due regard" to the "size of her estate" and the fact that Eleanor

Ball's incapacitation was permanent and that she would require a conservator and

guardian to manage her business affairs and  pay for her care during the remainder

of her lifetime. A.R.S. § 14-5425 (A) (2). That duty was inherently spelled out to

Morgan Stanley [Trust] prior to any Probate Court hearings

commencing by June 2004.  Upon investigation by audit and during the time of

their contract, the plaintiff

has been damaged.

241.   As a licensed fiduciary and court appointed conservator, SFI had a legal

duty to consider the

The Eleanor R. Ball Irrevocable Trust and Estate plan. A.R.S. § 14-5427.

242.   As the conservator and guardian of Eleanor Ball, both Morgan Stanley

[Trust]  had a legal duty to ensure that Eleanor Ball, as a vulnerable and

incapacitated adult, was protected from unlawful financial exploitation during the

time of their contract and that they would not allow her or her beneficiary to be

endangered or injured by the neglect, abuse or exploitation of itself by another.

A.R.S. § 46-555 (A) (B).

Upon investigation by audit and during the time of their contract, the plaintiff has

been damaged.

## LEGAL DUTIES OWING BY THE DEFENDANTS ARTHUR PAUL BLUNT AND BLUNT & ASSOCIATES.

243.   At all times mentioned herein, Defendant, Arthur Paul Blunt was a licensed

attorney practicing law within the State Bar of Arizona holding himself out as

being competent and capable of representing the legal ease of his vulnerable adult

clients and their financial liquidity and property.

244.   Among the fiduciary duties he took as attorney and counselor for SFI was

to be "responsible"

for Mrs. Ball's  "desires and wishes she had created prior to his employment".

245.   As a license attorney representing his clients interests of an incapacitated

adult, Blunts' duty

was the same "duty" respecting  Eleanor Ball as an attorney-client relationship by

ethics Rule 42 ARS not to

overbill for his time, counsel or actions that could damage her position or for those

not looking in her best interests to do the same. However, this did not happen

during his employment resulting in her estate and trust

being severely damaged and injured. It also resulted in emotional deprivation by

actively participating in separating her family toward the end of her life. Blunt

participated in psycological terror of the Ward prior

to his mother's death that same year.. This is significant because of the time that

was allowed to pass prior

to the death of Eleanor Ball on April 28, 2006, almost the same amount of time the

plaintiff lost from being able to contact his mother within the last 8 months of her

life. As a result, the plaintiff has been damaged.

246.    As counsel for SFI and the disinherited daughter, Carol L. Ball, Blunt had a

duty to insure the comfort, care and support for the client including her emotional

and physical welfare and if he thought or had knowledge of the lack there of, he

had a duty to report it which he did not including the relationship of the daughter

in conflict with the interests of the mother and the plaintiff. His removal as

attorney for SFI or Carol L. Ball in spite of numerous requests by Jonathan P.

Schubert and the plaintiff to remove him on a "conflict

of interest" were ignored by the Probate Court Judges/Commissioners. As a result

the plaintiff has been damaged by examination of Blunts' billing records by audit.

The fact he charged SFI for his time with

SFI and Carol L. Ball was an ethic rules violation Rule 42 1.5 violations double

billing SFI for time of both

parties by which this unlawful act subjects Blunt to FELONY GRAND THEFT

totalling over $65,000.00.

247.   His failure to intervene into the case due to the guardian and conservator

abuse by SFI and their defendant owners Gregory & Peggy Ann Dovico owed to

an incapacitated and vulnerable adult as defined by law with a duty to Eleanor Ball

to secure appropriate medical and psychological care and social services. A.R.S. §

14-5312 (A) (9). This also did not happen during his watch that ultimately led to

her death and wasting away of her and her husband's legacy by those that

participated in the Enterprise under the RICO statues, Civil Rights Statues, Breach

of Fiduciary Duty Statues, APSA- Title 46-455-456 Statues, Constructive Trust,

Tortuous Interference With Inheritances, Violations of 14th Amendment Due

Process and Invalidation of State Court Orders due to Common Law Fraud and

Racketeering by all of the Defendants.

248.   Blunt had a legal duty to "take into consideration" Eleanor Ball's "values

and wishes" in regard to serving as counsel. This also did not happen because of

her wishes to return home after her brief hospitalization in June 2004.

249.   Blunt had a duty to SFI for Eleanor Ball, an incapacitated adult,  to "exercise

care" to "conserve" Eleanor Ball's "excess" assets for her "needs" as opposed to

SFI's own profit motive.  A.R.S. § 14-5312 (A) (4).  His failure to act and protect

her from vulnerable adult exploitation was a breach of his duty to "exercise care" to "conserve" the assets placed in the care of Morgan Stanley [Trust]. His failure to return her home to the plaintiff's care costing and bilking out her trust and estate as the alternative was unnecessary and criminal. Blunt allowed the entire estate and trust to fall in disarray by audit over $1,000,000 in actual damages and is eligible for treble damages by statue ARS 46-455-466.

250.    Defendant Blunt and Blunt & Associates, owed a legal duty to SFI for Eleanor Ball to "actively work toward limiting or terminating the guardianship and seeking alternatives to guardianship". A.R.S. § 14-5312 (A) (7). That also did not happen nor was he interested in communicating with the plaintiff about his mother's care. As a result, the plaintiff has been damaged by his conduct and that of his company and associates,

in particular, Carol Stevens-Gobillard whom by audit shared handsomely in the fees Blunt collected. She too is

considered by the plaintiff a defendant and has also damaged the plaintiff as his once associate.

251.    Pursuant to A.R.S. § 14-5401 (2) (B), SFI was in part appointed as Eleanor Ball's conservator to prevent the dissipation of Eleanor Ball's property and funds which were necessary for her support, care and welfare. This was done despite that Morgan Stanley [Trust] was her Successor Trustee & Asset Manager.

252.    By agreeing to act as the conservator, SFI was obligated to observe the

standard of care

applicable to trustees in safeguarding Eleanor Ball's property as defined by A.R.S. § § 14-10804 and 14-10806. *See* A.R.S. § 14-5417. Blunt did participate in the activities of SFI therefore allowing them free reign to damage the estate and trust of their client, Eleanor R. Ball including having Blunt prepare a transfer of ownership

quit claim deed to Mid-Country Bank on March 15, 2005 without notifying anyone what they were doing with Illinois Trust Property or Morgan Stanley [Trust]. As a consequence fee and clear trust property at 1110 W. Cherry Street, Marion, Illinois was given away for $1.00 without compensation and for nothing. The plaintiff has been damaged. and demands punitive damages by Defendant Blunt and Blunt & Associates including SFI who signed the transfer. The Bank is also liable because they did not research who was the legal owner and assumed SFI had the authority to conduct the transfer which was only given to the trustee, Morgan Stanley [Trust].

253.   The court's appointment of SFI as Eleanor Ball's conservator, did not transfer to SFI any trust assets or otherwise alienate or void The Eleanor R. Ball Irrevocable Living Trust 05/10/01, A.R.S. § 14-5420 B.

254.   As a licensed fiduciary and court appointed conservator, SFI owed Eleanor Ball a legal duty to "expend or distribute sums" reasonably necessary for her care and benefit "with due regard" to the "size of her estate" and the fact that Eleanor

Ball's incapacitation was permanent and that she would require a conservator and guardian to manage her business affairs and pay for her care during the remainder of her lifetime. A.R.S. § 14-5425 (A) (2). Blunt allowed defendants Dovico, The Estate of Jonathan P. Schubert & 1st Mercury Insurance, Encore Senior Living, Morgan Stanley [Trust] to bill and expend unreasonable and excessive fees at the cost and expense of Eleanor Ball without her input or consent or that of the plaintiff.

255.   Defendants Arthur Paul Blunt and Blunt & Associates, allowed defendants, The Estate of Jonathan P. Schubert and 1st Mercury Insurance (surety) caused the demise of the trust and estate of their client, Eleanor R. Ball and the Eleanor R. Ball Irrevocable Living Trust, Blunt had a legal duty to consider an honor The Eleanor R. Ball Irrevocable Trust and Estate plan. That did not happen. As a result, the plaintiff has been damaged as a result of allowing all of the defendants to raid the trust and estate without care or consideration of Eleanor Ball nor the plaintiff. The following happened:

256.   As the conservator and guardian of Eleanor Ball, SFI had a legal duty to ensure that Eleanor Ball, as a vulnerable and incapacitated adult, received proper and adequate medical care and that her health would not be endangered or injured by the neglect, abuse or exploitation of itself or another. A.R.S. § 46-555 (A) (B).

257.   As a licensed fiduciary, guardian and conservator, SFI was obligated to comply with the rules and code of conduct adopted by the Arizona Supreme Courts

to establish minimum standards for certified fiduciaries. These rules include AACJ § 7-202 which require fiduciaries to:

A.   The fiduciary shall make reasonable efforts to determine the preferences of the ward or protected person, both past and current, regarding all decisions the fiduciary is empowered to make.

B.   The fiduciary shall make decisions in accordance with the determined preferences of the ward or protected person, past or current, in all instances except when the fiduciary is reasonably certain the decision will result in substantial harm.

C.   The fiduciary shall maintain an awareness of their limitations and shall carefully consider the views and opinions of those involved in the treatment, care and management of the ward, protected person, or estate and shall also seek independent opinions when necessary.

D.   The fiduciary shall recognize their decisions are open to the scrutiny of other interested parties and, consequently, to criticism and challenge. Regardless, the fiduciary alone is ultimately responsible for decisions made on behalf of the ward, protected person, or estate.

E.   The fiduciary shall refrain from decision making in areas outside the scope of the guardianship, or conservatorship, or personal representative order. When necessary and in the best interests of the ward or protected person, the fiduciary shall assist the ward or protected person by ensuring decisions are made in an autonomous fashion.

As the court appointed guardian, conservator and fiduciary, SFI had a duty to abide by the probate court rules, including but not limited to the preamble of the rules which provides:

The appointment of a guardian or conservator intrudes on the wards or protected person's liberty to make and carry out decisions regarding matters that may be of a very personal nature. The appointment of a guardian or conservator places the guardian or conservator in a position of trust and confidence with respect to the ward or protected person and imposes on the guardian or conservator the highest duty to act for the benefit of the ward or protected person.

For these reasons, these rules also are intended to ensure the protection of the due process rights of persons for whom the appointment of a guardian or conservator is sought. *See Preamble to Arizona Probate Rules and the National Probate Standards adopted by the Arizona Supreme Court in 2001. See Administrative Order 2001-63.*

258.   Beginning in March of 2004, Jonathan P. Schubert repeatedly informed SFI that Eleanor Ball's legal documents, including the general and medical power of attorney, vested in the plaintiff, Dennis Andrew Ball, the authority, power and legal duty to make all decisions regarding Eleanor Ball's assets that were placed in the trust as well as all decisions regarding Eleanor Ball's health care and well being.

259.   Beginning in March 2004, the plaintiff, Dennis Andrew Ball made repeated demands that SFI honor Eleanor Ball's legal documents, intent and wishes and that SFI dismiss their petition seeking to make unnecessary decisions regarding Eleanor Ball's medical care, well being and financial matters.

260.   Despite having knowledge of the legal documents attorney Jonathan Schubert ignored demands them, SFI ignored Eleanor Ball's legal documents and her most fundamental and important rights to have the plaintiff and Morgan Stanley [Trust] control her assets, medical care and well being.  As a result of their failure

and that of defendants, Arthur Paul Blunt and Blunt & Associates, the Plaintiff has been damaged.

In order for a person to be deemed incapacitated and for another to be appointed as a guardian and conservator, A.R.S. § 14-5303 requires a physician examination supporting the finding of incapacitation along with other important medical information regarding the person including "A prognosis for improvement in the alleged incapacitated person's condition and a recommendation for the most appropriate rehabilitation plan or care plan".

At all times, SFI, Encore Senior Village aka Encore Senior Living knew that Eleanor Ball was a vulnerable and incapacitated adult as defined by A.R.S. § 46-451 (A) (9).

## LEGAL DUTIES OWING BY THE DEFENDANTS JABURG & WILK & ATTORNEY KEVIN RATTAY.

261.   At all times mentioned herein, Defendants, Jaburg & Wilk & attorney Kevin Rattay of the firm was a licensed attorney practicing law within the State Bar of Arizona holding himself out as being competent and capable of representing the legal ease of his vulnerable adult clients and their financial liquidity and property.

262.   Among the fiduciary duties he took as attorney and counselor for SFI was to be "responsible"

for Mrs. Ball's "desires and wishes she had created prior to his employment".

263.   As a license attorney representing his clients interests of an incapacitated adult, Rattay's duty

was the same "duty" respecting  Eleanor Ball as an attorney-client relationship by

ethics Rule 42 1.5 ARS not

to overbill for his time, counsel or actions that could damage her position or for

those not looking in her best interests to do the same.  However, this did not

happen during his employment resulting in her estate and trust

being severely damaged and injured.  It also resulted in unnecessary expenses

being billed at an hourly rate for

charges and services adding up to little or no work.  As a result, the plaintiff has

been damaged.

264.   As counsel for SFI,  Rattay had a duty to insure the comfort, care and

support for the client, Eleanor Ball including her emotional and physical and

financial welfare and if he thought or had knowledge of the lack there of,  he had a

duty to report it which he did not including the relationship of the daughter in

conflict with the interests of the mother and the plaintiff.  He also had a duty to

preserve and protect the assets in the trust and report any improprieties by the

guardian that would jeopardize them. He did not with the plaintiff being

damaged by his relationship with the Guardian, Southwest Fiduciary, Inc. &

owners, Gregory P. & Peggy Dovico.

265.   His failure to intervene into the case due to the guardian and conservator

abuse by SFI and their defendant owners Gregory & Peggy Ann Dovico owed to

an incapacitated and vulnerable adult as defined by law with a duty to Eleanor Ball

to secure appropriate medical and psychological care and social services. A.R.S. §

14-5312 (A) (9). This also did not happen during his watch that ultimately led to her death and wasting away of her and her husband's legacy by those that participated in the Enterprise under the RICO statues, Civil Rights Statues, Breach of Fiduciary Duty Statues, APSA- Title 46-455-456 Statues, Constructive Trust, Tortuous Interference With Inheritances, Violations of 14th Amendment Due Process and Invalidation of State Court Orders due to Common Law Fraud and Racketeering by all of the Defendants.

266.   Blunt had a legal duty to "take into consideration" Eleanor Ball's "values and wishes" in regard to serving as counsel. This also did not happen because of her wishes to return home after her brief hospitalization in June 2004.

267.   Rattay had a duty to SFI for Eleanor Ball, an incapacitated adult,  to "exercise care" to "conserve" Eleanor Ball's "excess" assets for her "needs" as opposed to SFI's own profit motive.  A.R.S. § 14-5312 (A) (4).  His failure to act and protect her from vulnerable adult exploitation was a breach of his duty to "exercise care" to "conserve" the assets placed in the care of Morgan Stanley [Trust]. His failure to return her home to the plaintiff's care costing and bilking out her trust and estate as the alternative was unnecessary and criminal.  Rattay allowed the entire estate and trust to fall in disarray by audit over $1,000,000 in actual damages and is eligible for treble damages by statue ARS 46-455-466.

268.   Defendants Jaburg & Wilk and attorney Kevin Rattay,  owed a legal duty to SFI for Eleanor Ball to "actively work toward limiting or terminating the

guardianship and seeking alternatives to guardianship". A.R.S. § 14-5312 (A) (7).

That also did not happen nor was he interested in communicating with the plaintiff

about his mother's trust. As a result, the plaintiff has been damaged by his conduct

and that of his company and associates.

The plaintiff has been damaged by audit of unreasonable and excessive fees

charged the trust and estate.

269.    Pursuant to A.R.S. § 14-5401 (2) (B), SFI was in part appointed as Eleanor

Ball's conservator to prevent the dissipation of Eleanor Ball's property and funds

which were necessary for her support, care and welfare. This was done despite that

Morgan Stanley [Trust] was her Successor Trustee & Asset Manager.

270.    By agreeing to act as the conservator, SFI was obligated to observe the

standard of care

applicable to trustees in safeguarding Eleanor Ball's property as defined by A.R.S.

§ § 14-10804 and 14-10806. *See* A.R.S. § 14-5417. Defendants, Jaburg & Wilk

and attorney Kevin Rattay did  participate in the activities of SFI therefore

allowing them free reign to damage the estate and trust of their client, Eleanor R.

Ball including having and knowing that Mark Tripp and  Arthur Paul Blunt

prepare a transfer of ownership quit claim deed to Mid-Country Bank on March

15, 2005 without notifying anyone what they were doing with Illinois Trust

Property or Morgan Stanley [Trust]. As a consequence fee and clear trust property

valued at $50,000.00  at 1110 W. Cherry Street, Marion, Illinois was given away

for $1.00 without compensation and for nothing. The plaintiff has been damaged. and demands punitive damages by Defendants Jaburg & Wilk and attorney Kevin Rattay including SFI who signed the transfer. The Bank is also liable because they did not research who was the legal owner and assumed SFI had the authority to conduct the transfer which was only given to the trustee, Morgan Stanley [Trust].

271.   The court's appointment of SFI as Eleanor Ball's conservator, did not transfer to SFI any trust assets or otherwise alienate or void The Eleanor R. Ball Irrevocable Living Trust 05/10/01, A.R.S. § 14-5420 B.

272.   As a licensed fiduciary and court appointed conservator, SFI owed Eleanor Ball a legal duty to "expend or distribute sums" reasonably necessary for her care and benefit "with due regard" to the "size of her estate" and the fact that Eleanor Ball's incapacitation was permanent and that she would require a conservator and guardian to manage her business affairs and pay for her care during the remainder of her lifetime. A.R.S. § 14-5425 (A) (2). Blunt allowed defendants Dovico, The Estate of Jonathan P. Schubert & 1st Mercury Insurance, Encore Senior Living, Morgan Stanley [Trust] to bill and expend unreasonable and excessive fees at the cost and expense of Eleanor Ball without her input or consent or that of the plaintiff.

273.   Defendants Jaburg & Wilk and attorney Kevin Rattay, allowed defendants, The Estate of Jonathan P. Schubert and 1st Mercury Insurance (surety) caused the demise of the trust and estate of their client, Eleanor R. Ball and the Eleanor R.

Ball Irrevocable Living Trust, Rattay had a legal duty to consider an honor The Eleanor R. Ball Irrevocable Trust and Estate plan. That did not happen. As a result, the plaintiff has been damaged as a result of allowing all of the defendants to raid the trust and estate without care or consideration of Eleanor Ball nor the plaintiff. The following happened:

274.   As the conservator and guardian of Eleanor Ball, SFI had a legal duty to ensure that Eleanor Ball, as a vulnerable and incapacitated adult, received proper and adequate medical care and that her health would not be endangered or injured by the neglect, abuse or exploitation of itself or another.  A.R.S. § 46-555 (A) (B).

275.   As a licensed fiduciary, guardian and conservator, SFI was obligated to comply with the rules and code of conduct adopted by the Arizona Supreme Courts to establish minimum standards for certified fiduciaries.  These rules include AACJ § 7-202 which require fiduciaries to:

        A.     The fiduciary shall make reasonable efforts to determine the preferences of the ward or protected person, both past and current, regarding all decisions the fiduciary is empowered to make.

        B.     The fiduciary shall make decisions in accordance with the determined preferences of the ward or protected person, past or current, in all instances except when the fiduciary is reasonably certain the decision will result in substantial harm.

        C.     The fiduciary shall maintain an awareness of their limitations and shall carefully consider the views and opinions of those involved in the treatment, care and management of the ward, protected person, or estate and shall also seek independent opinions when necessary.

        D.     The fiduciary shall recognize their decisions are open to the scrutiny of other interested parties and, consequently, to criticism and challenge.  Regardless, the fiduciary alone is ultimately responsible for

decisions made on behalf of the ward, protected person, or estate.

E.      The fiduciary shall refrain from decision making in areas outside the scope of the guardianship, or conservatorship, or personal representative order.   When necessary and in the best interests of the ward or protected person, the fiduciary shall assist the ward or protected person by ensuring decisions are made in an autonomous fashion.

F.      As the court appointed guardian, conservator and fiduciary, SFI had a duty to abide by the probate court rules, including but not limited to the preamble of the rules which provides:

The appointment of a guardian or conservator intrudes on the wards or protected person's liberty to make and carry out decisions regarding matters that may be of a very personal nature. The appointment of a guardian or conservator places the guardian or conservator in a position of trust and confidence with respect to the ward or protected person and imposes on the guardian or conservator the highest duty to act for the benefit of the ward or protected person. For these reasons, these rules also are intended to ensure the protection of the due process rights of persons for whom the appointment of a guardian or conservator is sought. *See Preamble to Arizona Probate Rules and the National Probate Standards adopted by the Arizona Supreme Court in 2001. See Administrative Order 2001-63.*

276.   Beginning in March of 2004, Jonathan P. Schubert repeatedly informed SFI that Eleanor Ball's legal documents, including the general and medical power of attorney, vested in the plaintiff, Dennis Andrew Ball,  the authority, power and legal duty to make all decisions regarding Eleanor Ball's assets that were placed in the trust as well as all decisions regarding Eleanor Ball's  health care and well being.

277.   Beginning in March 2004, the plaintiff, Dennis Andrew Ball  made repeated demands that SFI honor Eleanor Ball's legal documents, intent and wishes and that SFI dismiss their petition seeking to make unnecessary decisions regarding

Eleanor Ball's medical care, well being and financial matters.

278. Despite having knowledge of the legal documents attorney Jonathan

Schubert's ignored them, SFI ignored Eleanor Ball's legal documents and her most

fundamental and important rights to have the plaintiff and Morgan Stanley [Trust]

control her assets, medical care and well being. As a result of their failure and A.

Paul Blunt,

and that of defendants, Jaburg & Wilk and attorney Kevin Rattay, the Plaintiff has

been damaged.

279. SFI and Dovico defendants pattern and practice of consciously depriving

vulnerable and incapacitated adults of their property, due process, liberty and other

fundamental rights justifies an award of punitive damages against these defendants

in an amount that is sufficient to deter them and others from acting in such an

egregious and criminal manner.

**WHEREFORE**, Plaintiff, prays for judgment against Defendants, severally

and jointly, for the following:

A.    For compensatory damages in a reasonable and appropriate amount;

B.    For exemplary or punitive damages in an amount sufficient to

      adequately deter defendants from engaging in such egregious

      conduct;

C.    For Plaintiffs' costs and expenses for prosecuting this matter;

D.    For Plaintiffs' reasonable attorneys' fees pursuant to A.R.S. §46-455

      and other statutes;

E.    For such further relief, orders and injunctions as the Court deems

      appropriate;

Plaintiff, hereby demand a trial by jury relative to the above-captioned matter on all issues so triable.

RESPECTFULLY SUBMITTED this 04th day of April, 2011.

Dennis Andrew Ball,

## COUNT 1

### FEDERAL RICO CLAIM UNDER 18 U.S.C. §§ 1961, 1962 *et seq.*

### (ALL DEFENDANTS)

Plaintiff incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

The federal RICO statutes create a private cause of action. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146-1147 (9th Cir. 2008) citing 18 U.S.C. § 1964(c). Racketeering means, in part, any act, "including any preparatory or completed offense" and includes knowingly executing or attempting to execute a scheme reasonably calculated to deceive persons of ordinary intelligence.[3]

A "scheme to defraud" under 18 U.S.C. § 1341 is measured by a nontechnical standard.[4]  Direct proof of willful intent is not necessary and may be inferred from activities of parties involved.[5]

Defendant's each had fiduciary duties and ethical obligations toward Plaintiffs which they intentionally violated for their own personal reasons, rendering them and others Wards of the State, at federal/state taxpayer expense.

Defendants' conduct is a scheme to obtain money, funds or other property under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. §1344. For the purpose of executing the scheme, Defendants placed in post offices or authorized depositories for mail, matters or things to be sent or delivered by the Postal Service or other private or commercial interstate carriers in violation of 18 U.S.C. § 1341.

---

[3]   *Cleveland v. U.S.,* 531 U.S. 12, 121 S. Ct. 365 (2000); *U.S. v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir. 1980).

[4]   *U.S. v. Kincaid,* 556 F.3d 923 (9th Cir. 2009); *U.S. v. Selby,* 557 F.3d 968 (9th Cir. 2009).

[5]   *United States v Reid,* 533 F2d 1255 (DC Cir. 1976); *Gusow v United States* 347 F2d 755 (10th Cir. 1965).

Defendants transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice in violation of 18 U.S.C. § 1343.

Defendants' acts as described in this Complaint occurred from early 2008 until the present and constitute a pattern of racketeering activity under 18 U.S.C. §§ 1961, 1962. Disclosure of this conduct occurred, at the earliest, by late February 2009.

Defendants' pattern of racketeering activity was committed in furtherance of an association-in-fact enterprise involving each of the Defendants, their employees, agents and attorneys. (the "Enterprise").[6]

Defendants and each of them violated 18 U.S.C. § 1962(a) by receiving income derived, directly or indirectly, from a pattern of activity by using or investing, directly or indirectly, any part of such income, or the proceeds of such income, in the establishment or operation of the Enterprise and it's beneficiaries - the Defendants.

Defendants and each of them violated 18 U.S.C. §§ 1961, 1962(b) *et seq.*, by acquiring or maintaining, directly or indirectly, an interest in or control of the Enterprise.

---

[6] *See generally, United States v. Bagaric,* 706 F.2d 42, 56 (2d Cir. 1983), *cert.* denied, 464 U.S. 840 (1983) ("it is logical to characterize any associative group in terms of what it does, rather than by abstract analysis of its structure."); accord *In re Gas Reclamation, Inc. Securities Litigation,* 659 F. Supp. 493, 516 (D.N.Y. 1987); *POM Wonderful LLC v. Purely Juice, Inc.,* 2009 U.S. App. LEXIS 28478, 7-8 (9th Cir. Dec. 28, 2009) (finding that a corporate officer is liable for torts he personally commits, and he/she "cannot 'hide' behind the corporation where he is an actual participant in the tort."); *In Walter v. Drayson,* 538 F. 3d 1244, 1244, 1249 (9th Cir. 2008) (finding that "[o]ne can be 'part' of an Enterprise without having a role in its management and operation"); *Living Designs Inc., v. E.1 DuPont,* 431 F.3d 353 (9th cir. 2005) (finding that attorneys employed by DuPont formed an enterprise as defined under the RICO statutes for misrepresenting and/or spoliating evidence, and/or in the failure to disclose in judicial proceedings documents material to the fair and impartial administration of justice.).

Defendants and each of them was/is employed by or associated with the Enterprise and violated 18 U.S.C. § 1962(c) by conducting or participating. directly, as set forth in this Complaint, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, as detailed above and below.

Defendants and each of them violated 18 U.S.C. § 1962(d) by conspiring to violate the provisions of subsection (a), (b), or (c) of 18 U.S.C. § 1962.

In the present case, Defendants have known and allowed the depletion of several of the Plaintiff's Estates & Trusts while taking an Oath to preserve and protect the laws so protecting these parties by the legal enforcement of these laws. The unlawful transfer of these assets by parties operating outside of State Law has created a *Rogue Cartel* of Unmitigating Parties responsible for the failure of their legacy and lives while those appointed and charged to protect sit on the sidelines and do nothing but allow the Plaintiff's to be picked clean. Each transfer, mailing, billing, or Court Order induced by Defendant's, constitues separate "predicate acts" in satisfaction of 18 USC & 1961-1962 *et seq.* One could surmise that the entire Probate Court in Maricopa County, Arizona is a rigged enterprise where the House Wins at all costs at the expense of the Plaintiffs. It is like being Lynched by Court Order!; clearly qualifies as a "scheme or artifice to defraud".

The Plaintiff's have been injured by the State of Arizona for its failure to protect the most basic precept of their Oath of Office to those who are the most Vulnerable of that which Society owes a debt of gratitude rather than punishment and exploitation of Society's mothers and fathers let alone those who are of adult age and Vulnerable but not yet of advanced age. These listed Defendant's represent those who have by reason violated section 18 U.S.C. & 1962, in an amount to be determined .

## RICO

**(18 U.S.C.S. § 1961 *et seq.*; Violation of 18 U.S.C. § 1962 (a); Violation of
18 U.S.C. § 1962(b); Violation of 18 U.S.C. § 1962(c); Conspiracy to
Violate 18 U.S.C. § 1962(a) in Violation of 18 U.S.C. § 1962(d);
Conspiracy to Violate 18 U.S.C. § 1962(d) in Violation
of 18 U.S.C. § 1962(d); Conspiracy to Violate 18 U.S.C. § 1962(c)
In Violation of 18 U.S.C. § 1962(d); Violation of 18 U.S.C. § 1964(c))**

104.   Plaintiff reincorporates all prior and subsequent enumerated paragraphs into this count, the FAC to be read as a unified whole.

105.   Defendants, and each of them, are charged with participation in the conduct of the affairs of an "enterprise" through a "pattern of racketeering activity and conspiracy" committing said offenses defined as "racketeering activities" under 18 U.S.C. § 1961(1) as "predicate acts" causing the Plaintiff injury to his business or property (18 U.S.C. § 1964(c) and under 18 U.S.C. § 1962(a)(b)(c)(d)).   An "enterprise" is broadly construed under 18 U.S.C. § 1961(4), which "broadly non-exhaustively encompasses any group of individuals associated-in-fact which includes, but is not limited to, business-like entities."

## SFI

Before appointment, SFI failed to file a disclosure affidavit with the Court as required to be filed by any conservator seeking appointment before such appointment can be approved by the Court.   ARS & 14-5106 and Ariz.R. Probate P. 20.   Such

disclosure requires the conservator appointee to provide to the court, under oath; whether the appointee has acted as a guardian or conservator for another person within three years of the petition; how many individuals the appointee is serving and how many terminated appointments the appointee has had in the last three years and with who [lawyers]; whether the appointee has ever been removed as a conservator and under what circumstances; the nature of the relationship between Eleanor Ball and the appointee and the appointee (and counsel), and how Eleanor Ball met Defendant SFI; whether the appointee, or an enterprise, has an interest in, ever received anything of value greater that $100.00, by gift, devise, or bequest from an individual or its estate (or counsel), to whom the appointee was not related and for whom the proposed appointee served as a guardian, conservator, trustee or agent; and whether the appointee has an interest in any enterprise providing housing, health care or other services to any individual.

SFI violated Ariz.R.Prob.P. 33 by disbursing money from Plaintiff's estate and trust prior to receiving court approval for such distributions.

SFI breached its fiduciary duties owed to Eleanor Ball by failing to provide services of value, by violating all Due Process Guarantees, statute, law and regulation enacted for Eleanor Ball's "protection", and not her financial exploitation.

Rather than fulfilling their duty to help Eleanor Ball become self-sufficient and independent as quickly as possible.  Defendants took other steps (or failed to take actions that they should have taken) to extend their tenure as conservators and maintain control over Eleanor Ball's assets and drain her estate, which is the normal course of business as conducted by the Enterprise in this, and all cases incorporated by reference.

SFI failed to explore or pursue claims that Eleanor Ball may have against others who are named in this complaint.   That was not their priority nor concern and to allow the State of Arizona to pay the cost of caring her after they looted her.

Defendants engaged instead in self-dealing to the detriment of Eleanor Ball.

Eleanor Ball was stripped of tens of thousands of dollars by Defendants. Moreover, this exploitation occurred under the supervision and direction of fiduciaries and trustees.

Defendants, and each of them, owed a duty to Eleanor Ball to ensure that his estate was maintained and protected from financial exploitation.   Instead, Defendants diverted funds, for their own pecuniary gain, and to the detriment of Eleanor Ball, as the RICO Defendants liquidated assets and failed to pursue all legal remedies available to protect Eleanor Ball.

The combined operations of SFI, through insider directors and officers, the Dovico's, along with Defendant Arthur Paul Blunt(deceased), Jonathan P. Schubert, in conjunction with all the other players and defendants, especially Morgan Stanley [Trust], constituted a distinct Enterprise within the meaning of the racketeering statutes, *infra*.   That Enterprise was functionally distinct from the individual Defendants, and existed continuously from at least 2004-2006.

*See also, Griffin. McNiff,* 744 F. Supp. 1237, 1244-1251 (SDNY 1990) (finding that plaintiffs pled with sufficient particularly claims made under RICO against lawyers, accountants and their respective firms); *Maxwell v. Southwest Nat'l.*

## ENTERPRISE

The enterprise of associated-in-fact individuals remains fairly constant throughout the *Long, Ravenscroft, Mallet and Hall* cases. In fact, in prior pleadings Defendants, and each of them, have moved to consolidate the proceedings, for all purposes because of the substantial similarity in identity of the RICO Defendants in all referenced cases (*i.e., Long, Ravenscroft, Mallet, and Hall*). "Enterprise" has been broadly and non-exhaustively construed as any group of individuals' associated-in-fact which includes, but is not limited to, business-like entities. *Boyle v. U.S.*, 129 S.Ct. 2237, 2243 (2009) ("structure" does not require the associated-in-fact Enterprise to maintain a "command post hierarchy" to qualify under the minimal standards associated with the structure requirements comprising an enterprise.) The Enterprise, for RICO purposes need not be motivated by an "economic purpose." *National Organization for Women, Inc. v. Scheidler*, 520 U.S. 249 (1994).

The conduct of the Enterprise qualifies under either an "open-ended" continuity analysis or a "closed-end" continuity analysis: The predicate acts date to at least 2005. Defendants have conceded that each predicate act under RICO in the mailing, wire transfer, or use of the U.S. Mail is actionable as a predicate act which was accomplished here, for all billings in execution of the scheme or artifice to defraud Plaintiffs out of their valuable assets and property. *Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131 (2008) (Supreme Court notes first-party reliance is not required, only that any third-party may rely upon Defendants actions, email or otherwise, causing damage to the Plaintiff; the Court's adoption of a "flexible" proximate cause analysis is

all that is required and where the mail and wire fraud predicate acts were directly related to the Plaintiff's injury is all that is required to sustain the RICO analysis).

The purpose of Defendants' RICO Enterprise was simply the improper acquisition of money from those under their care as attorney-client   fiduciaries, and to pick the pockets of the "protect person." The RICO Defendants were not to engage in self-dealing lining their own pockets to the Plaintiffs' ultimate financial demise.

The Plaintiff, Dennis Andrew Ball may stack the predicate acts arising out of similar cases involving the Enterprise which conduct has been incorporated by reference in     companion cases of *Mallet, Ravenscroft and Long.* Use of predicate acts involving the same Enterprise associated-in-fact individuals or entities are viable components of Plaintiff's well-pled "pattern" of unlawful RICO conduct. *Cf. H.J., Inc. v. Northwestern Bell Telephone*, 492 U.S. 229, 242 (1989); *Bridge v. Phoenix Bond & Indem. Co., supra; Accord, Depp v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) (although one of the racketeering acts was not successful does not mean that it is unavailable to establish a pattern); *See also, Banks v. Wolk*, 918 F.2d 418 (3rd Cir. 1990).

The Ninth Circuit has declined to impose a bright-line one-year test for "closed-end continuity." *Allwaste, Inc. v. Hinson*, 65 F.3d 1523 (9th Cir. 1995). The present cases demonstrate the acts were not isolated, sporadic, or short-term and conduct, as here, designed to conceal or prevent discovery of prior misconduct projects the threat of an "open-ended scheme" which imposes liability irrespective of brevity.

*Cf. United States v. Indelicato*, 865 F.2d 1370 (2nd Cir. 1989); *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147 (7th Cir. 1990).

      "Open-ended continuity" prevails in the instant action   given the fact that the Enterprise acts in a way which reflects upon its regular way of doing business, which is to strip the "protected" person  to whom they owe fiduciary responsibilities, of their assets,  *H.J., Inc., supra* at 492 U>S> 239, 242 (1989).  *See also, Tabas v. Tabas*, 492 U.S. 239, 242 (1989).  *See also, Tabas v. Tabas*, 47 F.3d 1280 (3rd Cir. 1995 (conduct post-dating Complaint filing evidence of "open-ended continuity" and is evidence of the Enterprises open-ended threat of continuing this conduct as Defendant's regular way of doing business).  Cover-ups also qualify as open-ended and furnish further evidence where the Defendants attempt to suppress dispositive material testimony and evidence involving obstruction of justice and are thus considered part of a "pattern of racketeering activity" for RICO purposes.  *U.S. v. Teitler*, 802 F.2d 606 (2nd Cir. 1986).

      As Plaintiff's plead, the scheme and pattern of racketeering activity engaged in by the Enterprise was to receive, in effect, bribes and kickbacks from one another denying Plaintiff fiduciary entitlements to the rendition of honest services under § 1346 as a defined predicate act under § 1961(1)(b).  *Cf., Skilling v. United States*, 2010 U.S. *LEXIS* 5259 (June 24, 2010); *Weyhrauch v. United States*, 2010 U.S. *LEXIS* 5254 (June 24, 2010).

      It is also a predicate act to exercise the wrongful use of an otherwise valid power (i.e., judicial appointment) that converts permissible action into extortion.  *U.S. v. Hyde*, 448 F.2d 815 (5th Cir. 1971).  Racketeering activity defined exhaustively under

§ 1961(1) includes bribery and extortion punishable under state law by imprisonment for more than one year which, in the instant case, exists as a class 1, 2, or 4 felony with respective periods of incarceration presumptively set at 5-10 years, 3.5-7 years, and 2.5-3 years respectively. A.R.S. § 13-1804(7); § 1951(b)(2).

Executing on a scheme or artifice to defraud while engaging in the material suppression of evidence obstructing the administration of justice is, in addition to a RICO predicate act, unconditionally prohibited by a legitimate duty requiring lawful conduct by officers of the court to be compatible with the very nature of a trial as a search for truth. *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988 (1986). Use of perjured or false evidence, or the material concealment thereof, where the lawyers know or reasonably should know the conduct is illegal or fraudulent is a fraud on the court and actionable. *Nix v. Whiteside, supra.* Perjury, or subornation of perjury through affidavit is, according to the *Nix* Court, as much a crime as tampering with witnesses (also a racketeering predicate offense), undermining the administration of justice. *Nix v. Whiteside, supra.*

The Defendants also conflate evidence of theft, extortion, and bribery as a roundabout way to obtain fee disgorgement under prior proceedings isolated to the Probate Court proceedings. Wrong. It is that evidence of theft, extortion, bribes and kickbacks as "predicate acts in a pattern" of racketeering activity as an enterprise, which is proof of the associated-in-fact Enterprise's conduct. It is the direct damages sustained to the Plaintiff's property which is at issue, and the manner and method Defendants executed on their scheme to liquidate the Plaintiff's assets unto themselves. A "fee contest" has little or nothing to do with this case and of course reflects upon

whether the issues presented in this matter were fully and fairly litigated in any underlying proceeding in any forum, at any time which, of course, there were not.

The multiplicity of ongoing predicate acts includes false attestations to Federal financial institutions for the purpose of unlawfully obtaining Plaintiff's property or assets. The fact that a bank, or the courts for that matter, or other State or Federal agencies, relied upon Defendants' emails, wires, electronic transmissions, or other documents is all that is required. Fiduciary Fraud under A.R.S. § 13-2201(2)(3) and A.R.S. § 13-2202(A)(2) are minimally Class 6 felonies with a presumptive period of incarceration of 1-1.5 years.

The Syndicate bribes are predicate acts under 18 U.S.C. § 201 under § 1961(1)(b) which include, but are not limited to: § 1341 (relating to mail fraud); § 1343 (relating to wire fraud); § 1344 (relating to financial institution fraud); § 1503 (relating to obstruction of justice); § 1510 (relating to obstruction of a criminal investigation); §1513 (relating to retaliation against the "protected person"); § 1952 (relating to racketeering); and § 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

Under §1961(1)(D), conspiracy is a viable predicate act. *U.S. v. Licavoli*, 725 F.2d 1040 (6th Cir. 1983); *U.S. v. Warneke*, 310 F.3d 542 (7th Cir. 2002). In the present case the Defendants' unanimous participation as selected in the audit chain necessarily reflects the mental intent required for a conspiracy claim under & 1962 (d) (*see, generally, Shearin v. E. F. Hutton Group, Inc.*), 885 F.2d 1162 (3rd Cir. 1989).

*Inc.*), 885 F.2d 1162 (3rd Cir. 1989). The First Amended Complaint has stated that the

agreements entered into by the Defendants, and each of them, were for the commission of at least two predicate acts by those associated with the Enterprise here. *See, Salinas v. United States*, 522 U.S. 52 (1997) (a conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense; the conspirator must intend to further the endeavor which, if completed, would satisfy the elements of a substantive criminal offense); *Id.* at 522 U.S. 65). Put another way, had the Defendants, in their fiduciary capacities, actually performed as required by law would necessarily exclude independent self interested behavior as an explanation for their conduct. The Defendants, and each of them, certainly had a strong, common motive to conspire because without the economic collaboration between the fiduciaries and lawyers, their economic interests in the estate would have deteriorated immediately absent the enterprise's monetary objectives in controlling the finances and assets. There is no other plausible explanation for the manner and method in which the lawyers and fiduciaries breached their duties to the "protected person" requiring secreted email and collaborative efforts unnecessarily protracting the guardianship and/or conservatorship proceedings.


Rule 9(b) provides that "malice, intent, knowledge, and other condition of mind may be averred generally" but, nonetheless, the Plaintiffs have provided hundreds of email, transcripts, deposition testimony, all reflecting upon defendants' collective intent which minimally give rise to a "strong inference" of fraudulent intent by engaging in conduct diametrically opposed to regulation, rule, and statute designed

to achieve the polar opposite of that conduct engaged in by Defendants. *O'Brien v. National Property Analysts Partners,* 936 F.2d 674 (2nd Cir. 1991).

120.   In addition to the specific dates, times and parties relative to the testimony and email provided, and in addition to specific dates, times, and Defendants perpetrating any given act of fraud, the Court is requested to take judicial notice of the underlying probate files, including the entire file contents, including email, electronic transmissions, electronic reception, work product, firm deposits, the dates, and/or the omissions, to act in accordance with prescribed law. *See, Moore v. Kayport Package Express, Inc.,* 885 F.2d 531 (9th Cir. 1989).

WHEREFORE, Plaintiff having fully pled this claim against Defendants under Count II, respectfully requests that this Court enter judgment in favor of Plaintiff and against all Defendants, individually, jointly and severally, and against their respective marital communities, if any, as follows:

A.     Awarding Plaintiff allowable statutory damages (trebled) resulting from Defendants' violations of the above-referenced RICO statutes;

B.     Awarding Plaintiff statutory entitlement to reasonable attorney's fees, together with a loadstar factor, costs and expenses associated with prosecution;

C.     Such other and further relief as the Court deems just and proper under the circumstances;

at trial, and are entitled to recover threefold the damages they have sustained as well as the costs of this suit, including reasonable attorney's fee.

**WHEREFORE,** Plaintiffs, having fully pled their claims against Defendants under Count I, respectfully requests that this Court enter Judgment in favor of Plaintiffs and against all Defendants, individually, jointly and severally and against their respective marital communities, if any,

## COUNT 2

### CIVIL RIGHTS (PRIVATE PARTIES) VIOLATIONS UNDER
### 42 U.S.C. §1983
### (ALL DEFENDANTS)

Plaintiffs now incorporates each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

Professional licensees, such as Defendants, are liable for violations of 42 USCS § 1983. (See generally *Kimes v. Stone,* 84 F.3d 1121 (9th Cir. 1996) (finding that the Supremacy Clause "prohibited application of state's litigation privilege bar to 42 USCS § 1983 action against attorneys").)

The Defendants and the Enterprise acted under color of state law, using: (1) named individual Defendants' law licenses and/or other professional licenses; (2) through the avenues for conducting business provided by the Arizona Corporation Commission, licensed through the Arizona State Supreme Court (all Defendants) and

---

[7] *See* A.R.S. § 13-2314 (allowing punitive damages for racketeering, constructive trusts and fraud); *Rhue v. Dawson,* 173 Ariz. 220, 841 P.2d 215 (App. 1992) (finding that Arizona law allows for punitive damages in a breach of fiduciary duty where the defendant's conduct reaches the requisite level of culpability.); *also see Western Coach Corp. v. Vaughn,* 9 Ariz. App. 336, 339, 452 P.2d 117, 120 (App. 1969) (allowing punitive damages for acts of corporate employees when committed in furtherance of employer's interest); *Hyatt Regency Phoenix Hotel Co. v. Winston,* 907 P.2d 506 (App. 1995).

the Arizona Department of Financial Institutions or other State and Federal agencies; and (3) regarding the probate functions and jurisdiction of the Superior Court in Maricopa County, to unilaterally deprive the Plaintiffs of their constititutional rights of liberty, property and due process rights by restricting her movements, stripping her cash, assets, and private property interests to improperly obtain financial gain under false pretense.

Private actor liability requires one of the following: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999); *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

Satisfaction of any one of the foregoing tests is sufficient to find state action. *Lee, supra*, at 276 F.3d at 554.

Once Defendants and the Enterprise, through the attorneys and other licensees as officers of the court, fiduciaries and/or court-appointed actors who participated in the Enterprise, sought to act without legal authority, or in excess of authority granted to them through the Courts, the acts of these individuals crossed the line from private enterprise to outright fraud and private party liability in the procurement of judicial orders in contempt of 42 U.S.C. §1983.

A professional license together with a court appointment is not a vehicle for immunizing the license holder or appointee from its prohibited use.

Defendants have acted with the intent to hinder, obstruct and/or evade culpability for their prohibited joint conduct under color of state law. [8]

---

[8] In *Lugar v. Edmondson*, 457 U.S. 922 at 924, 102 S.Ct. 2744, 73 L. Ed. 2d 482, the Court held that the private defendants who had initiated the attachment process could be liable as state actors for "participating in the deprivation": "Invoking the aid of state officials to take advantage of state-created attachment procedures" made the private defendants "*willful participants in joint activity* with the State or its agents." *Id. at 942*. See *Lugar, 457 U.S. at 941* ("We have consistently held that private party joint participation with state officials in the seizure of private property is sufficient to characterize the party as a 'state actor.'"); *see also Dennis v. Sparks, 449 U.S. 24, 27-*

Defendants unilaterally deprived Plaintiffs of their liberty and property in process to mask their own misconduct and were all willful participants in a joint activity with the State or its agents.

Defendants chose to fail the Plaintiffs out of their property & liquidity in violation of their constitutional due process rights by squandering and disbursing cash and assets of their [Trusts & Estates] color of state law and abusing their positions as fiduciaries and/or as licensed professionals to improperly obtain financial gain to the detriment and ultimately, the financial ruin of Plaintiffs loved ones.

The plaintiffs have been damaged by reason of Defendants' violations of section 42 U.S.C. § 1983, in an amount to be determined at trial.

WHEREFORE, Plaintiffs, having fully pled their claims against Defendants by Count II, respectfully requests that this Court enter Judgment in favor of Plaintiff and against all Defendants, individually, jointly and severally and against their respective marital communities, if any, as follows:

A.      Awarding Plaintiffs all allowable statutory damages resulting from Defendants' violations of Plaintiff's constitutional rights;

B.      Awarding punitive or exemplary damages in an amount sufficient to deter these Defendants or others similarly situated from violating the civil rights of vulnerable adults;

---

28, 66 L.Ed. 2d 185, 101 S. Ct. 183 (1980) ("Private persons, jointly engaged with state officials in the challenged action are action... 'under color' of law for purposes of §1983 actions."); States v. Price, 383 U.S. 787, 794, 16.L Ed. 2d 267, 86 S. Ct. 1152 ("private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of this statute to act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."); Fonda v. Gray, 707 F.2d 435.437 (9th Cir. 1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights.").

## COUNT 3

## INDEMNIFICATION

## (ALL DEFENDANTS)

The Plaintiffs incororate each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

Upon information and belief , Plaintiffs are entitled to indemnification from Defendants, and each of them, for all damages, attorneys' fees and/or costs that they have incurred or in the future will incurr in defending or satisfying claims and/or paying damages, attorneys' fees and/or costs that properly ought to be borne by Defendants, and each of them.

Upon information and belief, a special relationship, including a fiduciary one, existed between the Plaintiffs and Defendants and their professional corporations such that these Defendants as a matter of equity and justice should be required to pay any and all amounts for which Plaintifs may be held accountable or may be required to pay. Upon information and belief, Plaintiffs incurred damages, attorneys' fees and costs which are the natural and proximate consequences of the wrongful acts and conduct of Defendants and their professional corporations, and Plaintiffs are entitled to be indemnified for same under theories of implied indemnification, equitable indemnification and/or express indemnification.

As a direct and proximate result of the conduct of the Defendants, and each of them, Plaintiffs have been injured and/or damaged in an amount exceeding the amounts for compulsory arbitration and for which they are entitled to indemnification. The specific amount of such damages will be proven at trial,

against all Defendants, individually, jointly and severally and against their respective marital communities, if any, as follows:

     A.    Awarding Plaintiff all allowable damages resulting from Defendants' pattern of unlawful activity, pursuant to A.R.S. § 13-2314.04;

     B.    Awarding treble damages pursuant to subsection A of that same statute;

     C.    Awarding Plaintiff's costs and reasonable attorneys' fees pursuant to that same subsection;

     D.    Awarding punitive or exemplary damages in an amount sufficient to deter these Defendants or others similarly situated from engaging in the racketeering conduct alleged in this Complaint; and

     E.    Such other or further relief as the Court deems just and proper under the circumstances.

## COUNT 4

## BREACH OF FIDUCIARY DUTY/LEGAL MALPRACTICE

The Plaintiffs incorporate each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

The duty owed to the Plaintiffs by the State of Arizona to preserve protect and defend their rights is a history of criminal behavior with the prosecution of attorney Wayne Elmer Legg . *See, Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 200 Ariz. 146, 24 P.3d 593, 201 (2001); *See also, Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 98 P.3d 572 (App. 2004). Wayne Elmer Legg CR1994- 000200.

Their is evidence that Plaintiffs were invited on several occassions to rely on the protections afforded them by the State Probate Statues only to be exploited by firms & liability. *See generally, Kremser v. Quarles & Brady, L.L.P.*, 201 Ariz. 413, 418 (Ct. App. 2001); *Cf. Chalpin v. Snyder*, 220 Ariz. 413 (Ct. App. 2008).

State & Court Officials in their capacity as Judicial agents of Probate Court had the duty to ensure that the Plaintiffs were protected and maintained from financial exploitation and waste that their trust assets were used solely for their benefit. This did not happen.

Fiduciary duties were owed to the Plaintiffs and their loved ones from the power and authority their Offices Enjoined the Defendants not only in terms of their legal authority but the authority they demonstrated repeatedly in their execution of their Probate Adminstration and Abuse!

Defendants breached their professional and fiduciary duties to and by, among other things:

- Allowing or causing waste of the trust assets.
- Failing to prevent unnecessary and rapid depletion of the trust assets.

- Failing to obtain fair market value for trust assets sold by Defendants.
- Charging for unreasonable, unnecessary and duplicative fees for services performed allegedly on behalf of Plaintiffs.
- Failing to take any steps to mitigate or eliminate property liens against assets, preferencing payment to enrich themselves at taxpayer expense.
- Failing to establish, implement and monitor a viable estate plan.

These individual and collective breaches of fiduciary and professional duties by Defendants have caused foreseeable damage to Plaintiff in amounts to be proven at trial.

WHEREFORE, Plaintiff, having fully pled their claims against Defendants under Count IV, respectfully requests that this Court enter judgment in favor of

Plaintiff and against these Defendants, individually, jointly and severally and against their respective marital communities, if any, as follows:

    A.  Awarding Plaintiff all allowable actual damages resulting from Defendants' breaches of their fiduciary and/or professional duties;

    B.  Awarding punitive or exemplary damages in an amount sufficient to deter these Defendants or others similarly situated from engaging in the conduct alleged in Count IV; and

    C.  Such other or further relief as the Court deems just and proper under the circumstances.

## COUNT 5

### VIOLATIONS OF A.R.S. § 46-456

### (ADULT PROTECTIVE SERVICES ACT/VULNERABLE ADULT - "APSA")

### (ALL DEFENDANTS)

The Plaintiffs incorporate each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

In addition to claims for breach of fiduciary duty and malpractice, Plaintiffs are entitled by A.R.S. § 46-456, to bring claims against Defendants for their violations of the Adult Protective Services Act ("APSA"). *See Estate of Norman McGill v. Albrecht,* 203 Ariz. 525; 57 P.3d 384 (2002)(Holding that the plaintiffs in that case could raise claims under both the Medical Malpractice Act and the APSA).

At all times relevant to this Complaint,"Vulnerable Adults" as that term is defined in A.R.S. & 46-451.

At all times relevant to this Complaint, Defendants were all persons "in a position of trust and confidence" to Plaintiffs, pursuant to A.R.S. § 46-456, and were therefore required to "act for the benefit of "loved ones" to the same extent as a

trustee" and to use the Plaintiffs assets "solely for their benefit" and not for others own benefit.

Defendants knowingly violated A.R.S. § 46-456 by, among other things:

- Engaging in repeated acts of self-dealing;
- Overcharging;
- Billing for unnecessary services or services that did not benefit and to use the Plaintiffs assets "solely for their benefit"
- Failing to protect Plaintiffs assets.

As a direct and proximate result of Defendants' violations of the APSA, Plaintiffs suffered foreseeable damages in an amount to be proven at trial.

Defendants' individual and collective violations of their statutory duties to Plaintiffs under the APSA were done willfully or with reckless indifference to Plaintiff's rights and the damage those actions would inflict on them. Therefore, Plaintiffs are entitled to an award of punitive damages against Defendants.

WHEREFORE, Plaintiffs, having fully pled their claims aginst the Defendants under Count Five, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants, individually, jointly and severally and against their respective marital communities, if any, as follows:

A.   Awarding Plaintiff all allowable actual damages resulting from Defendants' violations of A.R.S. § 46-456;

B.   Awarding Plaintiff treble the amount the amount of her actual damages pursuant to A.R.S. § 46-456;

C.   Awarding punitive or exemplary damages in an amount sufficient to deter these Defendants or others similarly situated from engaging in the conduct alleged in Count V; and

D.      Such other or further relief as the Court deems just and proper under the circumstances.

<u>COUNT 6</u>

**FRAUD, A.R.S. §§ 44-1521**

**(All Defendants)**

Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

Under Arizona's Consumer Fraud statutes, the "use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any [services] whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

By engaging in the conduct described in this Complaint, Defendants, and each of them, are guilty of unlawful practices under A.R.S. § 44-1522(A) with regard to efforts to obtain payment for services that did not benefit Plaintiffs , were unnecessary or duplicative, or for which Defendants grossly overcharged and overbilled.

As a direct and proximate result of Defendants' violations of the Consumer Fraud Act,   Plaintiffs suffered foreseeable damages in an amount to be proved at trial.

Defendants' individual and collective violations of the Consumer Fraud Act were done willfully or with reckless indifference to     Plaintiffs rights and the damage, those actions would inflict on her. Therefore,   Plaintiffs are entitled to an award of punitive damages against Defendants.

## COUNT 7

### CONVERSION

### (ALL DEFENDANTS)

The Gist of a conversion *is* not the acquisition of the wrongdoer but the wrongful deprivation of another's property which the owner is entitled to possess.   Defendants SFI, Morgan Stanley [Trust], Estates of deceased attorneys Jonathan P. Schubert & Arthur Paul Blunt including estranged sibling Carol L. Ball *et al.,* all guilty of converting property from the rightful owner, Eleanor R. Ball and plaintiff, Dennis Andrew Ball.   Acts of fraud, deceptive practices and theft committed by the co-defendants to assist the primary defendants.

Upon information and belief, conspiracy to defraud by the systematic planning to convert the mother's personal property has been affirmed by audit to present as evidence at Trial of these parties

## COUNT 8

### CONSTRUCTIVE TRUST

### (ALL DEFENDANTS)

A Constructive Trust is a legal concept created by the courts against one who's unconscionable conduct, either has obtained or holds legal right to property to keep and enjoy. A relationship by which a person who has obtained title to property has an equitable duty to transfer it to whom it belongs, on the basis that the acquisition or retention of it is wrongful and would unjustly enrich the perpetrator of the theft.

## COUNT 9

TORTUOUS INTERFERENCE WITH INHERITANCES

USC Restatement (Second) of Torts, ch. 37A, & 774B

(ALL DEFENDANTS)

One who by fraud, duress or other tortuous means intentionally prevents another from a third person an inheritance or gift that he would otherwise have received, is subject to liability to the other for the loss of the inheritance or gift.   As our own Supreme Court so eloquently put it back in 1915, "[n]ot only the failure to permit such a cause of action give unnecessary protection to malice, but it also invites the courts to close their eyes to cause and effect and to a large segment of the realities of human affairs."   Mitchell v Langley, 85 SE 1050 (Ga. 1915).

These are predicate acts arising out of legal misconduct and judicial rubber stamping months after the acts have been committed like:

1.  Interference with expectancies under a will or trust;

2.  Interference with expected gifts;

3.  Interference with the rights to insurance proceeds and retirement plans;

4.  Interference with title to property (i.e. causing property or accounts to be re-titled as either joint tenancy with right of survivorship (JTROS) or payment on death (POD) to the wrongdoer); and

5.  Wrongfully causing someone to make inter vivos transfers.

Lewis v Corbin, 195 Mass. 520, 81 N. E. 248 (1907) (discussed infra). Both the former and latter cases are important because how often other jurisdictions cite them as the basis for tortuous interference claims in those states.   The fact that death had not occurred by the Grantor does not negate tortuous interference by the defendants to change the course of events to exclude

the plaintiff from his rightful inheritance by involuntary disinheritance by the taking of the trust corpus of the Ward, Eleanor R. Ball.   This is in effect exploitation and extortion of a vulnerable adult by those who took an Oath to preserve and protect the estate and trust of their client and is is punishable by punitive damages consistent with provisions cited by Title 46-456 ARS.

The fact that this status has not matured into a vested and irrevocable ownership of the beneficial interest, and that the member blocked to change it, does not authorize a third party to maliciously and fraudulently destroy the status and thus prevent the interest or expectancy of the beneficiary from maturing so that he will receive the fund.   The reserved right of the member is one thing; the malicious and fraudulent interposition of a third party to destroy the status is another.   Being that this falls under Complex Civil Litigation, the plaintiff has been damaged by all the defendants.

## COUNT 10
### Rule 60 Independent Action/Savings Clause
### and Rule 60(c)(4)/60 (b)(4)
### (all Defendants)

.     Rule 60 provides an independent action clause to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud on the court, typically by officers of the court as occurred in the present case. Likewise, the judgments entered in excess of jurisdictional authority, or without jurisdiction at all, or in violation of the law, are void.

Where the fiduciaries and lawyers assigned for the protection of the "ward" or "protected person" agitate for his (her) defeat, the fraudulent is assured that property will not be taken through government authority absent notice and an opportunity to be heard. *Morrison v. Shanwick Int'l Corp.*, 167 Ariz. 39, 42, 804 P.2d 768 (Ct.App. 1990).

# WHAT OTHERS WHO HAVE ALSO BEEN IMPACTED HAVE TO SAY

Misrepresentations, conflicts of interest, and duties to the tribunal are impaired to such

an extent that, as here, Mr. Hall had absolutely no chance of vindicating his property or

liberty interests. This concerted action by and between the fiduciaries and "appointed"

lawyers engaged in "extrinsic fraud" in securing funds for themselves at the expense of

the client. *In the Matter of the Estate of Thurston,* 199 Ariz. 215, 16 P.3d 776 (Ct.App.

2000).  As such there is a heightened duty where a fiduciary relationship exists, as here,

between the lawyers, the fiduciaries, and the lawyers acting in a fiduciary capacity to

deal fairly, and not fraudulently, and to disclose the true facts. Where, as here, the

Defendants, and each of them, refused to reveal the truth while denying Mr. Hall any

opportunity at hearing or otherwise for adequate representation, and where the

fiduciary (or lawyer) personally profits by his fraudulent conduct, the justification in a

collateral proceeding to set aside the judgment is appropriate. *Id.*  There is no dispute in

the present matter that the accounting records were not made fully available for

examination in a timely manner, nor were documents shared advising as to the

hemorrhaging of the estate to and for the benefit of assigned attorneys and fiduciaries.

The preceding evidence is overwhelming that the attorneys in collusion with the

fiduciaries prevented Plaintiff from knowing the status of the probate proceedings, and

that he was denied access to any documents or information concerning the financial

status of the estate and was prevented from asserting any claims regarding estate assets.

*In re Thurston, supra.*  Such self-serving and deceptive conduct is actionable.

The Court, under Rule 60, has inherent power to relieve a party from a

judgment, order, or a proceeding for fraud on the court by officers of the court. Where

the fraud rises to the level of an unconscionable plan or scheme designed to improperly

proceedings void. *In re Maxwell*, 146 Ariz. 27, 703 P.2d 574 (Ct. App. 1985). There are no records with respect to any suit (other than here) pending before this Court, or incorporated by reference for consideration, where evidence of conduct sustaining each and every count is predicated, in part, upon unqualified breaches of Titles 36 and 14. There does not exist, nor has it ever been the legislative intent to confine criminal misconduct arising out of administration of probate proceedings to the Probate Court. (*See* A.R.S. § 14-5429(A)(B)(C)(D) which allows for "concurrent jurisdiction" and "other proceedings" in which the conservator as a fiduciary is individually liable in suit and who may be sued directly in its individual capacity or its fiduciary capacity.) Attorneys appointed for the protection of the ward and the unqualified protection of Mr. Hall's own resources cannot act in an adverse and conflicted fashion against Mr. Hall; any such conduct by the fiduciary, authorized and ratified by its attorneys, is imputed to the attorney, or attorneys under A.R.S. § 14-5652(B). A.R.S. § 14-5408(a)(1) provides jurisdiction to probate jurists only that power to "preserve" and protect the ward's assets for his or her own benefit, or the benefit of that person's dependents. The statute does not allow jurisdiction, constitutionally, allowing the Probate Court to disregard attorney-client relationships freely entered into by the "protected person." A conservatorship does not impair one's right of contract given the fact that "incompetency" is no longer at issue by virtue of the temporary guardianship or permanent guardianship dismissals which are *res judicata* as to the "mental capacity" of the "protected person." Further, there is no conservatorship statute limiting, or purporting to limit a Plaintiff's constitutional right to counsel of his or her own choosing to pursue recovery. Those being sued are absolutely conflicted out to prevent retention on the basis of self-interest

from attempting to regulate, interfere, or undermine the attorney-client relationship brought by the self-sustaining and independent adult individuals, of contracting age, formerly under guardianship. Additionally, an attorney arguing for his own prospective liability limitations (all have) attempting to act as constitutional "gatekeepers" while engaging in acts of theft and criminal conduct renders void, or voidable, court orders invading the attorney-client relationship which seeks to level the playing field as against the offending fiduciaries and attorneys.

A.R.S. § 14-5408(B) has absolutely no "effect" on the capacity of the protected person in the conservatorship setting. Judgments, decrees, minute entries, court orders, "appointments," fraudulent and intentionally delayed "accounting" obtained by officers of the court, by their very nature are frauds on the court, and have no issue or claim preclusive effect which include the fact that under state law an official applying a "rubber stamp" to the Probate proceedings are subject to set aside, at any time, without qualification. *Estate of P.K.L.*, 189 Ariz. 487, 943 P.2d 847 (Ct. App. 1997). In the present matter, A.R.S. § 14-5411 required sufficient bonding to protect the "protected person" from his supposed protectors, the lawyers and fiduciaries, in the event of negligent or other culpable conduct damaging the assets owned by the ward. In the *Hall* matter, as in *Ravenscroft, Long* and *Mallet*, the bonding amounts were *de minimis* in contrast to the unauthorized and undisclosed disbursements to the Defendants, and each of them. A.R.S. § 14-1406 provides further evidence that Defendants, and each of them, may only operate "to the extent there is no material conflict of interest ..." *Olivas v. Olivas*, 132 Ariz. 61, 643 P.2d 1031 (Ct. App. 1982) (fraudulent conduct accruing in 1959 required judgment set aside of separate proceedings brought 20 years prior

resulting in this 1982 opinion). *Cf. Ivancovich v. Meier*, 122 Ariz. 346, 348-49, 595 P.2d 24, 26-27 (1979) (party deprived of the opportunity to present his or her case in court on the merits [this case in particular without disclosure of intentionally concealed and/or spoliated documents] is considered a fraud on the court). Defendant Theut intentionally failed to advise Mr. Hall of his constitutional due process right to petition the Court to remove and expunge the guardianship or protective proceedings under A.R.S. § 14-5307 nor did Defendant Theut or his law firm advise Mr. Hall under A.R.S. § 14-5303 requiring a physician's report and comprehensive testing listing any functional impairments together with a prognosis for the immediate future and opportunities for improvement, on a short term basis, to truncate the proceedings.

.     Ariz. R. Prob. P. 33 does not provide for an *ex post facto* "rubber stamp" approving after the fact payment, advances and distributions diminishing Mr. Hall's assets for attorney and fiduciary funding, without notice, without review, without Department Accounting Review provided by Probate Administration, without advising Mr. Hall that his assets had been, and continued to be, depleted, in secret. And, as discussed above, lawyers engaged in the scope of representation directly, or in a direct fiduciary relationship for the protection of assets (not for a "beneficiary") are absolutely prohibited and barred from entering into agreements or exercising purported authority under color of law that attempts to prospectively limit their liability. *See,* Ariz. R. Supp. Ct. 42, ER1.8(a)(1); *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664; 2010 Ariz. *LEXIS* 11 (Feb. 12, 2010) (lawyers claiming limitations for their own legal malfeasance were rejected in this Arizona Supreme Court opinion).

third-parties unrelated to any "attorney-client" relationship, concealment of the emails and other electronic transmissions were expressly waived long ago.  Importantly, the Plaintiffs and each of them, directly paid for the work product, files, and all material generated which related, or which may have related, to them whether in attorney-client fashion or under strict fiduciary standards requiring return of the files to the Plaintiff bearing upon a conspiracy and conduct designed expressly to undermine and intentionally breach fiduciary duties owed concurrently to the Plaintiffs as the "protected persons" and as the owner, not merely the beneficiary of, Mr. Hall's cash and assets (wiped out), Ms. Long's cash and assets (wiped out), Ms. Mallet's cash and assets (wiped out) and the invasion and failure to defend against invasion of Mr. Ravenscroft's assets exceeding $600,000 in "professional fees" and approximately $2 million in "waived" claims against M&I Bank, because, of course, in Mr. Ravenscroft's case M&I Bank held Mr. Ravenscroft's assets which were distributed to Defendants; in that case a *quid pro quo* for fiduciary and attorney "fees" held by M&I Bank in a CD.

### Intentional Statutory Breaches in Underlying Probate Proceedings as Evidence of Actionable Conduct

Defendants, and each of them, conflate the Counts of (I) Intentional Spoliation; (II) RICO; (III) Private Party Civil Rights Liability Under 42 U.S.C. § 1983; (IV) Violation of Constitutional Due Process Guarantees and Equal Protection; (V) Rule 60 Independent Action/Savings Clause and Rule 60(c)(4) and its Federal Rule counterpart; and (VI) Breach of Fiduciary Duty in these actions which incorporate causes of action wholly independent from, and distinct from, the "probate" proceedings,

which are merely evidence of violative conduct under Counts I-VI, and **_not_** litigated under Titles 36 or 14 of the Arizona Revised Statutes.

.       Defendants, and each of them, have knowingly and intentionally violated the Code of Professional Conduct, applicable Fiduciary Codes adopted by the Arizona Supreme Court, and have intentionally set aside legislative enactments under Titles 36 and 14, and elsewhere, engaging in a RICO conspiracy all "appointed" by the same fiduciaries, lawyers, and "appointees." The Enterprise, by definition, is incestuous.

.       Defendants, and each of them, intentionally breached Public Health and Welfare Statutes obtaining "appointments" under color of law from state officials obtaining Court Orders in violation of statute, rule, and the State and Federal Constitutions.

.       Mr. Hall, as with Ms. Long and Mr. Ravenscroft, were all entitled to Veterans Administration benefits to the extent a guardianship or conservatorship were needed for a limited period of time at pennies on the dollar to the extraordinary damage sustained. The Defendants, and each of them, failed to apprise, advise and instruct Mr. Hall, as with Mr. Ravenscroft and Ms. Long, that VA treatment and oversight were available, and in the "best interests" and conservation of Plaintiffs' assets.

.       Defendants, and each of them, pre-approved, unilaterally without notice or a right to be heard by the Plaintiff as his or her private property interests were quietly liquidated without Court approval, or Court oversight, or audit, until the RICO Defendants, and each of them, had sufficiently exhausted the assets of those to whom an attorney-client duty and/or fiduciary duties were owed in violation of Rule and Statute, and in violation of the Due Process Clause and the Equal Protection Clause.

.     State action, in violation of the Federal and State Constitutions, Federal and State statutes, and Local Rules, provided Defendants, and each of them, with the opportunity to obtain an *ex post facto* "rubber stamp" relative to the asset liquidations. There are no statutory or other legislatively enacted provisions, or rules of court which provide for these credit advances as against uncontrolled and unauthorized expenditures rendering these proceedings, constitutionally defective. *In re Maricopa County,* MH-90-00566, 173 Ariz. 177, 840 P.2d 1042 (Ct. App. 1992). Failures to comply with due process considerations in the absence of any pre- or post-deprivation hearings, under color of state law, render the underlying guardianship and conservatorship proceedings void or voidable. *In re* M.H. 2007, 001236, 230 Ariz. 160, 204 P.3d 418 (Ct. App. 2008); *In re* M.H. 220 Ariz. 277, 205 P.3d 1124 (Ct. App. 2009). The "fee" liquidations disclosed months and in certain cases such as *Long and Ravenscroft* a year or more after the fact precludes Plaintiffs' right under the Confrontation Clause denying due process under the Sixth Amendment to the U.S. Constitution. *In re* MH 222 Ariz. 287, 213 P.3d 1014 (Ct. App. 2009).

.     Statutes intentionally breached include, but are not limited to: (1) A.R.S. § 14-5652(B) (fiduciaries and attorneys for the "ward" cannot act in an adverse and conflicted fashion against the "protected person" with such conduct by the fiduciary authorized and ratified by its attorneys, inputted to the attorney or attorneys as a matter of legislative prerogative); (2) A.R.S. § 36-506 (unconditionally prohibits denial of any civil rights of the "ward" or "protected person"); (3) Probate and Mental Health Cases, Local Rules of Maricopa County, Rule 5-5.4 (no reviews ensured "compliance" with the laws of the State of Arizona and Court Rules); (4) 5.6/A.R.S. § 14-5106.

**COUNT 11**

VIOLATIONS 14TH AMENDMENT
DUE PROCESS

(ALL DEFENDANTS)

**Violations of Federal/State Constitutional Due Process
Guarantees and Equal Protection**

.     Plaintiff incorporates each and every allegation contained in the above

paragraphs of this First Amended Complaint as though fully set forth herein.

Private property interests, without hearing, without notice, in secret were

liquidated to the Defendants and each of them (and their employer law firms) in

violation of well established law and accepted practices under the 14th Amendment Due

Process Clause. *Mullane v. Central Hanover Bank & Trust Co.,* 399 U.S. 306 (1950).

The fact that the state approves the absence of pre- or post-deprivation hearings, post-

liquidation of assets purportedly protected by the fiduciaries and lawyers assigned to

and for the benefit of the "protected person" does not, and cannot, constitutionally

authorize the deprivation of property interests without appropriate procedural

safeguards, of which there were absolutely none in the present matter. *Logan v.*

*Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148 (1982). The *Logan* Court also

addressed certain Equal Protection arguments endorsed by Justice O'Connor in her

concurrence relative to the Due Process Clause, which is applicable in the instant case.

.     Due process requires that courts make certain that proper professional

judgment was "in fact" exercised in the denial of a liberty interest and that due process

## PREDICATE ACTS COMMITTED AGAINST ELEANOR R. BALL

enumerated statutory breaches littered throughout the FAC, the fiduciaries and attorneys merely liquidated assets, cash, distributions and Mr. Hall's assets to themselves. The scheme or artifice to defraud included "advance" payment of fees, expenses and costs irrespective of propriety and irrespective of any oversight or judicial review. The payments are *per se* unlawful and fraudulent transfers with respect to Mr. Hall and must be held under a constructive trust. There is no statutory allowance for the fiduciaries and attorneys to self-regulate their own payments from Mr. Hall and his assets prior to some form of judicial review, and *prior* to payment authorization by SFI, even were that legitimate, which, of course, it is not.

Over the course of his "representation" of Mr. Hall, Theut continued to bill Mr. Hall but failed to provide any service of value because his services had no value. Each "billing" is a "predicate act."

. During its conservatorship, SFI took every opportunity to "milk" Mr. Hall's estate, despite its oath that it would "perform, according to law, the duties of such fiduciary."

. Defendants have charged exorbitant, duplicative and unreasonable fees for their services, and have advocated positions and engaged in actions designed to benefit themselves.

When Theut filed the Emergency Petition, it failed to comply with several rules and statutes. For instance, the Emergency Petition failed to comply with A.R.S. § 14-5401.01 because it did not properly set forth the emergency that necessitated the appointment. The Emergency Petition merely cites there is an emergency but fails to establish any facts demonstrating immediate action is necessary.

Mr. Hall was deprived of important and necessary procedural protections designed to protect vulnerable adults. These deprivations concealed potential conflicts and connections between Theut and SFI. This concealment furthered and facilitated the ability of the Enterprise to accomplish its goal of billing for services that were neither desired nor needed by Mr. Hall.

Moreover, Theut did not advise Mr. Hall of his rights flowing from the hearing regarding appointment of guardian and conservator. Theut did not advise Mr. Hall of his right to petition for termination of the conservatorship.

### Mr. Hall's Procedural and Substantive Due Process Rights.[2]

. The December 22, 2006 hearing was deficient in several respects.

. Required interview(s) and psychological evaluation(s) were not done or filed for the December 22, 2006 hearing. A.R.S. § 14-5407 requires that an investigator interview Mr. Hall and an appropriate medical or psychological evaluation be conducted. (*See also,* Title 36, *infra.*)

. These failures are particularly egregious in light of the Social Security Administration finding that Mr. Hall was "able to think, communicate, and care for his own needs" a month later.

---

[2] The Due Process Clause guarantees more than fair process, and the "liberty" it protects includes more than the absence of physical restraint. *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992) (Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them'") (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993); *Casey*, 505 U.S. at 851.

The Probate Court allowed        ovico   SFI to commit material violations

of the Probate Code and Arizona Statutes, as set forth herein, causing direct harm to

Plaintiff by allowing Defendants to defraud Plaintiff under the color of state law by

state actors through private parties as Officers of the Court.

Instead, the Court, in complete derogation of its obligations to Mr. Hall,

continued the conservatorship for more than one year prompted by Defendants.

Mr. Hall suffered damages as a direct result of Defendant's intentional

conduct.

The Court's failure to enforce its own rules and complete disregard for

Mr. Hall's substantive and procedural due process rights created a zone of danger

subjecting vulnerable adults like Mr. Hall to the predatory practices of his court-

appointed attorneys, and conservator.[3]

SFI accepted appointment as conservator on January 11, 2007, and agreed

to perform the fiduciary duties associated with such appointment.

---

[3]   United States courts have recognized a constitutional right to be free from "state-created danger," which occurs when "state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in absence of state intervention.'" *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003)). A state-created danger claim has four elements: (1) 'the harm ultimately caused was foreseeable and fairly direct'; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff was such that the 'the plaintiff was a foreseeable victim of the defendant's acts,' or a 'member of a discrete class of persons subjected to the potential harm brought about by the state's actions,' as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Id.*

WHEREFORE, Plaintiff having fully pled this claim against Defendants under Count IV, respectfully requests that this Court enter judgment in favor of Plaintiff and against all Defendants, individually, jointly and severally, and against their respective marital communities, if any, as follows:

A.     For an order granting Plaintiff relief setting aside all orders, minute entries, and judgments arising out of the underlying probate proceedings;

B.     Awarding punitive or exemplary damages in an amount sufficient to deter these Defendants or others similarly situated from violating the civil rights of vulnerable adults; and

C.     Such other or further relief as the Court deems just and proper under the circumstances.